IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,338

In the Matter of ERIC M. GAMBLE,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held May 10, 2024. Opinion filed November 8, 2024. Six-month suspension stayed, conditioned upon successful participation and completion of a 12-month probation period.

*Kate Duncan Butler*, Deputy Disciplinary Administrator, argued the cause, and *Gayle B. Larkin*, Disciplinary Administrator, was on the formal complaint for the petitioner.

*Christopher M. McHugh*, of Joseph, Hollander & Craft L.L.C., of Kansas City, Missouri, argued the cause for the respondent, and *Eric M. Gamble*, respondent, argued the cause pro se.

PER CURIAM: This is an attorney discipline proceeding against Eric M. Gamble, of Shawnee. Gamble received his license to practice law in Kansas on September 26, 2003.

On February 9, 2023, the Disciplinary Administrator's office filed the Formal Complaint against Gamble alleging violations of the Kansas Rules of Professional Conduct. The complaint stemmed from Gamble's actions as an attorney in contentious domestic cases. These cases, separately filed in two states, related to protection from abuse, child support, child custody, and divorce.

Respondent answered the Formal Complaint on March 3, 2023.

On December 22, 2023, the parties entered into a summary submission agreement under Supreme Court Rule 223(b) (2024 Kan. S. Ct. R. at 275) (summary submission is "[a]n agreement between the disciplinary administrator and the respondent," which includes "a statement by the parties that no exceptions to the findings of fact or conclusions of law will be taken").

In the summary submission agreement, the Disciplinary Administrator and Gamble stipulate and agree that Gamble violated the following Kansas Rule of Professional Conduct (KRPC): KRPC 8.4(d) (2024 Kan. S. Ct. R. at 430) (conduct prejudicial to the administration of justice).

FACTUAL AND PROCEDURAL BACKGROUND

We quote the relevant portions of the parties' summary submission below.

"*Findings of Fact*

"5.     Under Rule 223(b)(2)(B) (2023 Kan. S. Ct. R. at 277), the parties stipulate to the following findings of fact:

"6.     The respondent, Eric M. Gamble, is an attorney at law, Kansas attorney registration number 21250. The Supreme Court admitted the respondent to the practice of law in Kansas on September 26, 2003. The respondent's most recent registration address with the Office of Judicial Administration is 12400 West 62nd Terrace, Suite H, Shawnee, Kansas 66216.

"7.     On July 10, 2020, D.L.R. and J.D., attorneys, filed a complaint against the respondent. D.L.R. signed the complaint on behalf of her law firm. The complaint stems from an underlying PFA case, an emergency custody action, and a divorce case filed in Wyandotte County District Court in late 2019 and early 2020. D.L.R.'s sister, S.G. was a party in the three actions. D.L.R. and J.D. represented S.G. in the PFA case

2

and emergency custody case. After the respondent entered his appearance in this case, D.L.R. did not appear with S.G. in the PFA case or the emergency custody case. J.D. represented S.G. in the divorce case.

"8.     On January 23, 2020, the respondent entered a limited entry of appearance in the PFA case and the emergency custody action.

"9.     On January 30, 2020, J.D. requested a phone conference with the district court in part seeking an order to sell the jointly held marital home, to which respondent emailed the district court and J.D. as follows:

'Good afternoon:

'My thoughts are that I would caution the court about moving so swiftly with these matters considering there is no personal jurisdiction over my client in the State of Kansas to enter orders of child support or to assume subject matter jurisdiction. In addition, he hasn't even been served with the divorce yet so I am unaware under what legal authority would allow the court to proceed with selling the parties' home without having jurisdiction or venue. As much as [J.D.], her boss, and her client would like to shove this matter forward at light speed and sell the parties home, I haven't even had the chance to file my answer yet as the transcripts have not been made available to me (they have been paid for). Wyandotte County does not have any connection with this matter other than [D.L.R.] wanted it filed there in order to have a home court advantage for her sister. It's called forum shopping at its finest. All of these issues will be put into my memo in due time. The Utah court has not made a final decision on whether to assume jurisdiction contrary to what counsel has stated. Moreover, wife has entered an appearance and has fully answered in Utah. There have been many procedural errors made associated with this matter from what I can see. So, in order to protect everyone's interests involved, and avoid future interlocutory litigation, I would urge patience and taking things one step at a time. I have shared the court's expectations with my client. As everyone is aware, I have been retained to contest jurisdiction and venue and that is what I am going to do. I expect to have my brief on file within 2-3 weeks. Anyone who has been in

3

private practice for a while should understand that sometimes we have to take unpopular legal positions that go against the grain. This is one of those circumstances for me. Thank you.'

"10.    On March 10, 2020, the parties filed a joint motion to continue the hearing scheduled for March 26, 2020, to allow the parties time to mediate the pending issues. The parties did not resolve their disputes through mediation.

"11.    On March 26, 2020, the respondent entered a limited entry of appearance in the Kansas divorce action. Two days later, on March 28, 2020, the respondent filed a motion to strike and request for sanctions in the Kansas divorce action.

"12.    Between March 28, 2020 and April 2, 2020, the respondent filed three documents in the PFA case and the emergency custody action—the first omnibus motion, the amended omnibus motion, and the second amended omnibus motion. The three motions were substantially similar. In the two subsequent motions, the respondent made minor changes. Each of the motions extensively cited the transcripts of hearings that took place in the PFA and emergency custody matters on December 4, 2019, and December 10, 2019.

"13.    In the motions, the respondent made multiple requests for relief, including relief from a PFA order and reconsideration of findings previously made by the district court.

"14.    In each of the three motions, the respondent included D.L.R.'s home address, he made unnecessary and objectionable remarks about D.L.R. and her family, and he attached newspaper articles regarding D.L.R.'s extended family. The respondent could have effectively argued his client's position without including that information.

"15.    On April 2, 2020, the day that respondent filed the second amended omnibus motion, the respondent sent an email message to the district court that provided as follows:

4

'Dear Judge,

'Attached is our second amended motion and memoranda in support of our motions to dismiss and for sanctions. Considering the nature of these cases and the substantial errors that were made, I am forwarding the Court this chamber copy which was submitted to E-flex today.

'We believe the court should, sua sponte, take immediate action to remedy the harm that has been done to my client and these minor children. Due to what we have discovered through the various transcripts and filings, my client does not believe mediation is an appropriate option at this time. We respectfully request the Court act on these matters without haste because as more time passes the more these children suffer and damages accrue to my client. In a normal situation, a 14 day response time would be prudent. However, based upon our memorandum, I do not see how one can even make a good faith argument that these facts were properly applied to the law. Thank you.'

The district court did not immediately take action, rather the court provided S.G. with the opportunity to respond to the omnibus motions.

"16.    On April 17, 2023, S.G. filed a response to the respondent's motion to strike in the Kansas divorce action. Additionally, S.G. filed a motion to strike portions of the respondent's second omnibus motion and requested that sanctions be imposed.

"17.    On April 21, 2020, the district court conducted a hearing on the respondent's second amended omnibus motion. At the hearing, the respondent did not call any witnesses or offer any exhibits to further establish the contentions that he made in the second amended omnibus motion. Further, the respondent did not withdraw the objectionable statements made about D.L.R.

"18.    The district court concluded that in the respondent's motion to strike and the second amended omnibus motion, the respondent included irrelevant information for the purpose of diminishing S.G., lodged inflammatory attacks on J.D., D.L.R. and their

5

law firm that served no legal purpose, and improperly accused S.G.'s counsel of forum shopping.

"19.    On May 4, 2020, the district court denied the respondent's motion to alter or amend the judgment as untimely. The court also denied the respondent's motion for a new trial as untimely. The court concluded that venue was appropriate in Wyandotte County. The court concluded that the respondent's argument that S.G. misled the court about where she lived prior to mid-November 2019, lacked merit. The court concluded that an emergency situation existed because D.G. displayed a firearm to S.G. and the children. The court concluded that it followed proper procedure and that the court's exercise of temporary jurisdiction was appropriate given all the circumstances. The court denied the respondent's motion for sanctions because it lacked merit. The court summarily rejected the respondent's claim that S.G., J.D., and D.L.R. engaged in a pattern of conduct involving deception. The court granted S.G.'s motion to strike and awarded attorneys' fees against D.G. in the amount of $1,000.

"20.    On May 18, 2020, the respondent filed motions to withdraw from representing D.G. in the three cases. On May 26, 2020, the district court granted the respondent's motions.

"*Conclusion of Law*

"21.    Under Rule 223(b)(1), the respondent admits that he engaged in misconduct. Under Rule 223(b)(2)(C), the parties stipulate that the findings of fact stated above constitute clear and convincing evidence of a violation of KRPC 8.4(d) (conduct prejudicial to the administration of justice).

"22.    KRPC 8.4(d) provides that '[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.'

"23.    The parties stipulate that the respondent's strategy employed with his motion practice was prejudicial to the administration of justice, in violation of KRPC 8.4(d) (conduct prejudicial to the administration of justice). The motions impugned the integrity of the judicial process and created an unnecessarily adversarial relationship with

6

opposing counsel. Other than the citations to the transcripts of the December hearings, the respondent did not present evidence to establish the allegations in the motions nor did he withdraw the objectionable statements made about D.L.R. This resulted in the court's time and expense for all involved, including sanctions ordered against respondent's client.

"*Aggravating and Mitigating Factors*

"24.     *Aggravating Circumstances.* Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. Under Rule 223(b)(2)(D) (2023 Kan. S. Ct. R. at 277), the parties stipulate that the following aggravating factors are applicable in this case:

"25.     *Prior Disciplinary Offenses*. The respondent has been previously disciplined on three occasions.

"a.     In 2005, the respondent participated in the attorney diversion program for having violated KRPC 4.2.

"b.     In 2013, following a hearing, a hearing panel of the Kansas Board for Discipline of Attorneys concluded that the respondent violated KRPC 8.4(d) and directed the disciplinary administrator to impose an informal admonition.

"c.     In 2014, the Supreme Court suspended the respondent from the practice of law for six months for violations of KRPC 8.4(d) and KRPC 8.4(g). *In re Gamble,* 301 Kan. 13 (2014).

"d.     On October 21, 2016, the Supreme Court reinstated the respondent's license to practice law. The respondent's license to practice law has been active and in good standing since reinstatement. *In re Gamble,* 305 Kan. 375 (2016).

"26.     *Substantial Experience in the Practice of Law*. The Supreme Court admitted the respondent to practice law in the State of Kansas in 2003. At the time of the misconduct, the respondent had been practicing law for more than 15 years.

"27.     *Mitigating Circumstances.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. Under Rule 223(b)(2)(D) (2023 Kan. S. Ct. R. at 277), the parties stipulate that the following mitigating factors are applicable in this case:

"28.     *Absence of a Dishonest or Selfish Motive*. The respondent's misconduct was not motivated by dishonesty or selfishness.

"29.     *Personal or Emotional Problems if Such Misfortunes Have Contributed to the Violation of the Kansas Rules of Professional Conduct*. The respondent has availed himself of the Kansas Lawyers' Assistance Program's resiliency group for support in coping with the general stressors associated with the practice of law.

"30.     *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the Wyandotte County bar, the Johnson County bar, and Jackson County, Missouri, bar. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by Exhibits Q, R, and S, found in Volume III of the record.

"31.     *Remorse.* The respondent is genuinely remorseful for engaging in the conduct and violating KRPC 8.4(d). The respondent demonstrated his remorse by accepting responsibility through this agreement. Further, the respondent[] is remorseful for engaging in the misconduct and will memorialize his remorse by issuing the apology letters as part of the probationary conditions discussed below.

"32.     *Remoteness of Prior Offenses.* The misconduct which gave rise to the diversion in 2005 is remote in time and character to the misconduct in this case. The misconduct which gave rise to the informal admonition in 2013 and the suspension in 2014 is remote in time but not in character to the misconduct in this case.

"33.     *Any Statement by the Complainant Expressing Satisfaction with Restitution and Requesting No Discipline*. While restitution is not applicable in this case and the recommendation in this agreement is not a recommendation for no discipline, when asked for his position on discipline, the judge involved in the underlying litigation recommended that the respondent not lose his license as a result of the violation in this case. D.L.R. also recommend[ed] that the respondent not lose his license as a result of the violation in this case. The position of those impacted by the misconduct is a compelling mitigating factor.

"*Applicable ABA Standard*

"34.     The parties stipulate that ABA Standard 7.2 applies in this case. That standard provides, '[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty as a professional and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation for Discipline*

"35.     Based on the findings of fact, the conclusion of law, the aggravating factors, the mitigating factors, and ABA Standard 7.2 and under Rule 223(b)(3) (2023 Kan. S. Ct. R. at 277), the parties jointly recommend that the Supreme Court suspend the respondent's license for 6 months, that the imposition of the suspension be stayed, and that the respondent be placed on 12 months of probation subject to the following terms:

"a.     The respondent's practice will be supervised by Daniel Parker of Abogados Parker & Parker, 535 Central Avenue, Kansas City, Kansas 66101, as follows:

"(1)     The respondent and the practice supervisor will correspond monthly by phone, video conference, or in-person meeting to discuss the respondent's practice and identify any practice modifications or resources that would benefit the respondent in his practice of law. The respondent and practice supervisor began the practice supervision on July 26, 2023.

9

"(2)    In all highly contested domestic law cases (identified by significant motion practice, appointment of a guardian *ad litem*, and cases with unique facts that present[] highly charged issues), the respondent will provide any pleadings and motions to the practice supervisor for review and feedback prior to filing. The purpose of the review is to have a detached, neutral attorney provide strategic feedback on the language and asserted basis.

"(3)    While occurring infrequently, the respondent will have the practice supervisor review and provide feedback on any motions for sanctions and/or attorney fees prior to filing, as well as any responses to such motions filed by an opposing party. The purpose of the review is to have a detached, neutral attorney provide strategic feedback on the language and asserted basis.

"(4)    The respondent shall comply with any requests made by the practice supervisor and follow all recommendations of the practice supervisor.

"(5)    The respondent shall be responsible for any fees charged for the practice supervisor's services.

"b.    The practice supervisor will provide a written report to the respondent and the disciplinary administrator on a monthly basis with the following information:

"(1)    date(s) of meeting(s) with the respondent and method of meeting;
"(2)    brief summary of what was discussed; and
"(3)    whether, or not, the practice supervisor reviewed any pleadings or motions relating to sanctions and/or requests for attorney fees within the report period.

"c.    The practice supervisor shall be acting as an officer and agent of the Supreme Court while supervising the probation of the respondent. The

practice supervisor will be afforded all immunities by Rule 238 (2023 Kan. S. Ct. R. at 311), during the course of the supervision.

"d. The respondent has participated in KALAP's resiliency group meetings and will continue to participate in those meetings throughout the probationary period unless documented emergency or unique circumstances prevent his participation.

"e. The respondent shall provide a written report to the practice supervisor and the disciplinary administrator on a monthly basis with the following information:

"(1) date(s) of meeting(s) with the practice supervisor and method of meeting;

"(2) brief summary of what was discussed;

"(3) whether, or not, the respondent filed any pleadings or motions relating to sanctions and/or requests for attorney fees within the report period; and

"(4) dates of participation in KALAP's resiliency group meetings or the documented emergency or unique circumstances that prevented the respondent's participation.

"f. Within 30 days of the date of the Supreme Court's opinion in this case adopting the probation plan, the respondent will send a letter of apology to D.L.R. and J.D. and a letter of apology to Judge Mahoney that acknowledge and take responsibility for the misconduct. The respondent will provide copies of the letters to the practice supervisor and the disciplinary administrator.

"g. The respondent will not violate the Kansas Rules of Professional Conduct. Should the practice supervisor discover any violations of the Kansas Rules of Professional Conduct during the report period, he will include such information in the next report to the disciplinary administrator. Additionally, the respondent will self-report any violations of the Kansas Rules of Professional Conduct within 14 days of the violation.

"h.      The respondent will participate in any scheduled meetings or phone calls with the Office of the Disciplinary Administrator and provide information as requested by the Office of the Disciplinary Administrator.

"i.      Should unforeseeable circumstances present that would require substituting the practice supervisor, the respondent will work with the disciplinary administrator to select a substitute practice supervisor. Similarly, if any other unforeseeable circumstance arises hindering the respondent's ability to substantially comply with this plan in any respect, he will work with the disciplinary administrator and the practice supervisor to make necessary modifications to the plan of probation.

"*Additional Stipulations and Procedures*

"36.      *Waiver of Hearing.* Under Rule 223(b)(4) (2023 Kan. S. Ct. R. at 277), the respondent waives the hearing on the formal complaint as provided by Rule 222(c) (2023 Kan. S. Ct. R. at 277).

"37.      *No Exceptions.* Under Rule 223(b)(5) (2023 Kan. S. Ct. R. at 277), the parties agree no exceptions will be taken.

"38.      *Notice to Complainants.* D.L.R. and J.D. filed the complaint against the respondent. After the Summary Submission Agreement is entered, the disciplinary administrator will provide a copy of the executed Summary Submission Agreement to the complainants. They will be given 21 days to provide the disciplinary administrator with their position regarding the agreement under Rule 223(d) (2023 Kan. S. Ct. R. at 277). The complaints' positions will be included in Volume IV in the record before the Supreme Court.

"39.      *Board Chair*. The parties acknowledge that after the complainants provide their positions or after 21 days have passed after the complainants were provided notice, the disciplinary administrator will provide a copy of the Summary Submission Agreement to the chair of the Kansas Board for Discipline of Attorneys along with a

12

copy of the complainants' position, if any. If the chair approves the agreement, the scheduled hearing on the formal complaint will be cancelled and the case will proceed according to Rule 228 (2023 Kan. S. Ct. R. at 287). If the chair rejects the agreement, the case will proceed to hearing as scheduled according to Rule 222 (2023 Kan. S. Ct. R. at 277).

"40.      *Oral Argument.* The respondent also understands and agrees that after entering into this Summary Submission Agreement he will be required to appear before the Supreme Court for oral argument under Rule 228(i) (2023 Kan. S. Ct. R. at 287).

"41.      *Effect of Agreement.* The respondent understands and agrees that pursuant to Rule 223(f) (2023 Kan. S. Ct. R. at 277), the Summary Submission Agreement is advisory only and does not prevent the Supreme Court from making its own conclusions regarding rule violations or imposing discipline greater or lesser than the parties' recommendation.

"42.      *Electronic Delivery and Signatures.* The parties agree that the Summary Submission Agreement may be exchanged and executed by electronic transmission and that electronic signatures will be deemed to be original signatures."

DISCUSSION

In a disciplinary proceeding, this court generally considers the evidence, the disciplinary panel's findings, and the parties' arguments to determine whether KRPC violations exist and, if they do, the appropriate discipline to impose. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see also Supreme Court Rule 226(a)(1)(A) (2024 Kan. S. Ct. R. at 279) (a misconduct finding must be established by clear and convincing evidence). "Clear and convincing evidence is 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009).

13

The Disciplinary Administrator provided Gamble with adequate notice of the formal complaint. The Disciplinary Administrator also provided Gamble with adequate notice of the hearing before the panel, but he waived that hearing after entering into the summary submission agreement.

Rule 223(b) establishes the following requirements for a valid summary submission agreement:

"An agreement between the disciplinary administrator and the respondent to proceed by summary submission must be in writing and contain the following:

(1) an admission that the respondent engaged in the misconduct;
(2) a stipulation as to the following:
(A) the contents of the record;
(B) the findings of fact;
(C) the conclusions of law, including each violation of the Kansas Rules of Professional Conduct, the Rules Relating to Discipline of Attorneys, or the attorney's oath of office; and
(D) any applicable aggravating and mitigating factors;
(3) a recommendation for discipline;
(4) a waiver of the hearing on the formal complaint; and
(5) a statement by the parties that no exceptions to the findings of fact or conclusions of law will be taken." Rule 223(b) (2024 Kan. S. Ct. R. at 275).

The Kansas Board for Discipline of Attorneys approved the summary submission and canceled the formal hearing under Rule 223(e)(2). As a result, the factual findings in the summary submission are deemed admitted. See Supreme Court Rule 228(g)(1) (2024 Kan. S. Ct. R. at 285) ("If the respondent files a statement . . . that the respondent will not file an exception . . . the findings of fact and conclusions of law in the final hearing report will be deemed admitted by the respondent."). Here, the written summary submission agreement contained all the information required under Rule 223(b). And the summary

14

submission and the parties' stipulations before us establish by clear and convincing evidence the facts occurred as stipulated.

However, the parties' agreements on conclusions of law are not binding on this court. We make our own conclusions. Yet, we recognize that here the parties have also agreed that the conduct established by clear and convincing evidence violated KRPC 8.4(d), in that respondent "engaged in conduct that is prejudicial to the administration of justice."

But it is difficult to discern whether respondent violated this rule under these facts. We have previously rejected challenges to KRPC 8.4(d) on vagueness grounds by emphasizing the importance of prejudice to the overall inquiry. See, e.g., *In re Comfort*, 284 Kan. 183, 199-201, 159 P.3d 1011 (2007). And we have concluded that a violation of KRPC 8.4(d) "includes any conduct that injures, harms, or disadvantages the justice system." *In re Spradling*, 315 Kan. 552, 618, 509 P.3d 483 (2022). See also *In re Kline*, 298 Kan. 96, 121, 311 P.3d 321 (2013); *In re Hawver*, 300 Kan. 1023, 1035, 339 P.3d 573 (2014). But here we are not faced with false or erroneous statements, prosecutorial misconduct, or incompetence. Instead, respondent's at-issue conduct was a choice of strategy—a choice that, in the eyes of the district court and the parties themselves, was so aggressive as to be unethical.

Within appropriate contours, aggression is no vice in litigation. But those contours lie at the heart of the practice of law; without them, litigation would largely recapitulate a nonviolent form of absolute war, where maximum ends justify maximum means. But law, despite its common depiction in popular media, is not war. The practice of law, much like adherence *to* the law, begins with respectful conduct; it is the soil from which justice—and, thus, civil society as a whole—grows. And while attorneys should represent their clients with zeal, their ardor must be tempered with an appreciation for their role as

stewards of civil society—and of the damage their unethical conduct can cause to the very fabric of that society.

The administration of justice thus requires that attorneys act with restraint proportional to the situation before them. Admittedly, extreme circumstances may sometimes justify harsh conduct in litigation—but an attorney must always be mindful to keep that conduct proportional to the situation, lest it transcend the limits of ethical behavior and cause injury to the very system of justice within which it operates. Because a scorched earth strategy risks damaging the very framework of justice within which litigation operates, prudent counsel should opt for it, if at all, only as a last resort.

We are not a fact-finding court. Though the dissent gives us a detailed story of what facts *may or may not* have occurred both before and after litigation began in the underlying divorce-with-children case, the *assertions* as fact upon which the dissent's story relies violate this cardinal rule of appellate practice. Allegations asserted in divorce petitions, motions, and responses are just that–allegations. Preliminary orders prior to trial are subject to being set aside or superseded before the case is final. The reliability of all allegations and temporary orders in litigation depends on what can be proved at trial, when witnesses testify under oath and are subject to cross-examination, and when evidence is admitted only in compliance with the rules. Or by agreement.

The course of a formal disciplinary matter has a similar procedure. Anyone has the right to allege an attorney has violated the disciplinary code of ethics by signing a complaint. Accepting those fact assertions as true, the Formal Complaint is filed (docketed) only if an ethical violation *might* have occurred. The docketed Formal Complaint proceeds toward an adversarial formal hearing. That formal hearing is much like a trial, where testimony is given under oath and subject to cross-examination, and other evidence is admitted only if the panel finds it sufficiently reliable. Or the parties may enter into an agreement and submit the matter for our review without formal

16

hearing. Here, we have an agreement, and we are not free to fill in the factual blanks with assertions insufficiently tested. Again, we are not a fact-finding court.

And equating a disciplinary complaint with "crying in baseball" reduces the honorable and ethical duty of our profession to self-regulate into a toddler's outburst. Courts do not address interesting issues of the day. We address issues in *cases*. Cases begin with a complaint. The duty to prosecute a complaint in which an ethical violation may have occurred, pleasant or not, falls on the Office of the Disciplinary Administrator. While the parties are free to enter into a summary submission agreement, they also have the right to a formal hearing.

Here, after a motion hearing, the panel issued a preliminary order that Respondent's expert testimony would not be allowed as evidence at the formal (final) hearing before the panel. Had that preliminary order remained in effect for purposes of the formal hearing, Respondent could have filed an exception to that order, and any other finding of fact or conclusion of law made by the panel as part of its final order, so we could review those exceptions. Rule 228(e)(1) (2024 Kan. S. Ct. R. at 285). Perhaps the assertions and expert opinions extensively quoted in the dissent may have made the grade had they been submitted to us by exception for our review. But there was no hearing from which exceptions *could* be filed. And "[n]either party may file an exception in a case submitted to the Supreme Court by summary submission under Rule 223." Rule 228(f)(2). Thus, if there is no formal hearing before the panel, we do not get to tell a story about what the facts might have been, as if there *had* been a formal hearing before the panel. The facts we can consider are those set forth in the agreed summary submission agreement. While we have discretion under Rule 223(f) to make our own conclusions regarding rule violations if we think the record supports it, our record is limited to the facts set forth in the summary submission agreement under Rule 223(b)(2)(A)-(B)— unlike a disciplinary case that goes to formal hearing, where our record would be more robust.

Our duty, as an appellate court, is to determine whether there are sufficient facts submitted in the parties' summary submission agreement for this court to ascertain the existence of clear and convincing evidence to conclude that unethical conduct occurred.

The respondent has been an attorney for fifteen years and has been previously disciplined three times for violating the ethical code. Pertinent parts of the parties' summary submission agreement reveal the following facts:

- Respondent made "unnecessary" and "objectionable" remarks about D.L.R. and her family, and he attached newspaper articles regarding D.L.R.'s extended family. The respondent could have effectively argued his client's position without including that information.
- Respondent pushed for an expedited hearing on a motion, and then "did not call any witnesses or offer any exhibits to further establish the contentions that he made in the second amended omnibus motion. Further, the respondent did not withdraw the objectionable statements made about D.L.R."
- "The district court concluded that in the respondent's motion to strike and the second amended omnibus motion, the respondent included irrelevant information for the purpose of diminishing S.G., lodged inflammatory attacks on J.D., D.L.R. and their law firm that served no legal purpose, and improperly accused S.G.'s counsel of forum shopping."
- "The court concluded that the respondent's argument that S.G. misled the court about where she lived prior to mid-November 2019, lacked merit. The court concluded that an emergency situation existed because D.G. displayed a firearm to S.G. and the children. The court concluded that it followed proper procedure and that the court's exercise of temporary jurisdiction was appropriate given all the circumstances. The court denied the respondent's motion for sanctions because it lacked merit. The court summarily rejected the respondent's claim that S.G., J.D.,

18

and D.L.R. engaged in a pattern of conduct involving deception. The court granted S.G.'s motion to strike and awarded attorneys' fees against [respondent's client] in the amount of $1,000."

- Respondent entered into a joint stipulation now before us as evidence that he crossed the line of appropriate advocacy into the unethical realm of committing conduct prejudicial to the administration of justice.

- Respondent included in a pleading the personally identifiable information (PII) of opposing counsel's home address.

The parties agree these facts, and the others jointly presented, establish by clear and convincing evidence that respondent's actions demonstrate ethical misconduct "prejudicial to the administration of justice." The parties also agree respondent's misconduct supports suspension of respondent's license for six months.

We recognize that negotiated agreements rarely give a complete record of what an evidentiary hearing, replete with direct and cross-examination of witnesses, would reveal. But party stipulations are as much evidence as sworn testimony. See, e.g., K.S.A. 60-401(a) ("'Evidence' is the means from which inferences may be drawn as a basis of proof in duly constituted judicial or fact-finding tribunals, and includes testimony in the form of opinion, and hearsay."); *State v. Thomas*, 311 Kan. 403, 413, 462 P.3d 149 (2020) ("Probable cause determinations under K.S.A. 2019 Supp. 21-5231 must be premised on: [1] stipulations of the parties or evidence received at a hearing under the rules of evidence, or both; and [2] the reasonable inferences drawn from any stipulations or the evidence."); *Hardesty v. Coastal Mart, Inc.*, 259 Kan. 645, Syl. ¶ 1, 915 P.2d 41 (1996) (general rule is that trial courts are bound by a stipulation of the litigants); *White v. State*, 222 Kan. 709, 713, 568 P.2d 112 (1977) (stipulations as to evidence in criminal cases are permissible and are binding upon parties represented). And while the dissent objects vociferously that the facts presented in the parties' agreement are a "vacant lot," slip op. at 29, the respondent himself stipulated, for whatever reason, that his *actions* were

objectionable, unnecessary, inappropriate advocacy, prejudicial to the administration of justice, and unethical. However captioned, those opinions are unrefuted evidence, not conclusions by a neutral tribunal, and we cannot ignore them.

We also recognize the law encourages arms-length negotiated agreements among litigants on disputed matters. See *In re Estate of Thompson*, 226 Kan. 437, 440, 601 P.2d 1105 (1979) ("It is an elemental rule that the law favors compromise and settlement of disputes and generally, in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it."). Ultimately, we are persuaded there is clear and convincing evidence provided by these agreed facts to conclude respondent's conduct went beyond appropriate and ethical advocacy, such that his conduct unethically prejudiced the administration of justice and thus violated KRPC 8.4(d).

The dissent asserts that when respondents admit to facts, it imposes a "high responsibility on courts to thoroughly evaluate the struck bargain for both factual and legal appropriateness." Slip op. at 39. We are unaware of such heightened burden. Whether submitted by evidence through an adversarial system or by uncontested agreement, we review it under the same standard—ascertaining the existence of clear and convincing evidence to support a legal conclusion.

The remaining issue is deciding the appropriate discipline. Considering the findings, aggravating factors, and mitigating factors, a majority of the court finds that the discipline recommended by the parties and the Board should be imposed. A minority of the court would impose lesser or no discipline.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Eric M. Gamble is suspended for six months, effective the date of this opinion, in accordance with Supreme Court Rule 225(a)(3) (2024 Kan. S. Ct. R. at 278) for violation of KRPC 8.4(d). The suspension is stayed conditioned upon Gamble's successful participation and completion of a 12-month probation period. Probation will be subject to the terms set out in the probation plan as set forth in the parties' summary submission agreement and the practice supervision plan as approved by the Disciplinary Administrator's office. No reinstatement hearing is required upon successful completion of probation.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.

* * *

STEGALL, J., dissenting: "There's no crying in baseball!" So intoned Tom Hanks' character in the film *A League of Their Own* (Columbia Pictures 1992). It is a message the Kansas bar and bench—and our Disciplinary Administrator's office—should consider. Litigation—not unlike baseball—is an intense activity. Stressful. Demanding. Pitches thrown high-and-tight. Bang-bang plays. Split second rulings by the umpires. And some occasional dust kicking. But there is no crying. And if ordinary litigation is regular season baseball, custody disputes between warring parents are like a game seven in October between bitter rivals. A lesson today's case poignantly illustrates.

This disciplinary matter arises from a contentious and emotional divorce and custody battle between husband—D.G.—and his wife—S.G. For ease of reference, I will call them John and Jane. John and Jane lived in Utah with their children. Jane's large extended family is part of a break-away Mormon sect that migrated from Utah to Mexico

21

in the 1800s when Utah outlawed polygamy. The Mormon sect has been embattled in Mexico for many years. Jane maintained close ties with her extended family, and her desire to take the family's children to Mexico became the animating disagreement at the heart of the legal drama about to unfold.

John knew Jane's family was entangled in a violent milieu. Between 2016 and 2019, Jane took the children to visit family in Mexico three times—each time over John's objection. Then, in November of 2019, nine members of Jane's extended family— including six children—were murdered in Mexico by drug cartels. Jane made plans to attend the funerals and intended to take all the children. Fearing for his children, John refused to agree, and the two argued bitterly.

The day after the argument, Jane accused John of behaving in a threatening manner toward her and the children by placing his legally owned firearm in his waistband. John is a legal gun owner in Utah and had sometimes taken his eldest child to the shooting range. He asserted he was not threatening at all, but merely carrying his unloaded firearm to his truck, consistent with Utah's open carry laws. He denied placing the gun in his waistband.

After these events, Jane made arrangements—kept hidden from John—to take the children and flee the relationship to Kansas, where her sister, a practicing Kansas lawyer, would give them shelter. Ten days later, Jane absconded with the children and their passports to Kansas, moving in with her sister in Olathe. Jane's sister owned her own legal practice and employed an associate. Jane's sister and her associate would ultimately become the Complainants in this disciplinary action and will sometimes be referred to as either the Complainant or Complainants.

Almost as soon as Jane and the children arrived in Kansas, Jane's sister and her law firm began to assist Jane in forming a legal strategy to obtain a divorce from John

and win full custody of the children under the jurisdiction of Kansas courts. With the assistance of her sister, Jane immediately filed a Protection From Abuse action in Wyandotte County District Court, which was quickly granted.

Soon thereafter, represented by her sister's law firm, Jane filed a separate action in Wyandotte County District Court and sought emergency jurisdiction to determine child custody. Her motion was again granted, and the court signed an order granting Jane temporary sole custody of the children. Jane then enrolled the children in Kansas schools. Jane would eventually also file for divorce in Wyandotte County.

By December, John had figured out what was going on. On December 2, he filed a Petition for Divorce seeking sole legal custody of the children in Utah district court. Then, on December 9, John was served with process for the legal proceedings in Kansas. The next day, the Wyandotte District Court held a hearing at which John appeared. The court entered a protective order as between John and Jane. The court found, however, that John was not a danger to the children and dissolved the temporary protective order as between John and the children. The court entered a parenting plan granting John minimal parenting time, and Jane refused to allow the children to have a phone for the purposes of talking to their father.

John realized at this point that he needed Kansas counsel to represent his interests. In January of 2020, he retained the respondent in this action—Eric Gamble—to represent him in Kansas courts for the sole purpose of contesting jurisdiction and venue. As soon as Gamble got the case, he realized his client was facing an aggressive effort by Jane—and her family's law firm—to cut John completely out of his children's lives and to immediately dissolve all financial ties John had with his family. Gamble was confronted with a motion filed by Jane's sister in Wyandotte County to order the sale of the couple's jointly owned home.

In response, Gamble advised the Wyandotte County court that he had been retained by John and that these matters were moving far too quickly. He informed the court and Jane's counsel of the Utah divorce action and that the Utah court had not yet decided whether to assume jurisdiction. He accused Jane of forum shopping with the aid and counsel of her family law firm. Finally, he let the court know that he planned to file responses to all of Jane's legal filings soon, with the limited purpose of contesting jurisdiction and venue in Wyandotte County.

Soon, Gamble filed John's responses in all the pending Kansas actions. Central to his claim that Wyandotte County lacked jurisdiction and was an improper venue, Gamble argued to the court that Jane and the children had no connection to Wyandotte County and were actually living in Johnson County with Jane's sister—who of course was also opposing counsel. To provide evidence of his claim that Jane and the children lived in Johnson County, Gamble included the Complainant's home address in his filings. Gamble likewise presented to the court the broader factual circumstances by describing Jane's extended family in Mexico and their involvement with violent happenings. To support these claims, Gamble included press reporting on the murders. He likewise included text messages demonstrating that both Jane and the Complainant were actively interfering with his efforts to communicate with his children.

Gamble argued to the court that given all of these facts—that John's children had been taken without his knowledge or permission by Jane to be secreted away at her attorney sister's home in Johnson County; that Jane and her family's law firm were aggressively taking legal actions in Wyandotte County seeking to cut John completely out of the family; that Jane's intentions to take the children to a potentially violent situation in Mexico were clear; and that Jane and her sister were actively preventing John from communicating with his children—the court would be justified in taking immediate and sua sponte action to protect John and the children.

The court declined this invitation, ordered responses from Jane, and scheduled a hearing. Following that hearing, the court ruled against John on all his claims. The court found jurisdiction and venue were proper in Wyandotte County; rejected Gamble's contention that Jane and her sister were forum shopping; concluded that Gamble's inclusion of the Complainant's address was improper; and awarded $1,000 of attorney fees to Jane. Soon thereafter, Gamble filed motions to withdraw as John's counsel in all the Kansas legal proceedings and the court granted his request. Several months later, Jane's sister and her associate filed an ethics complaint against Gamble with the Office of the Disciplinary Administrator, which took up the prosecution of Gamble with some fervor.

The ODA filed a formal complaint against Gamble alleging serious ethical violations. Gamble vigorously denied wrongdoing and as is evident from his response, was prepared to rebut every ethical allegation. He retained and planned to present testimony from two legal experts—Kansas lawyers who do domestic work—that all the evidence and argument Gamble presented in the underlying actions was relevant, proper, and necessary to the legal issues in play. But the testimony of those experts was disallowed by the panel, at the ODA's insistence, because it ruled the expert opinions would be "unhelpful." The ODA maintained that the experts' opinions that Gamble's presentation of argument and evidence was appropriate, relevant, and necessary amounted to legal conclusions which they were not—as experts—qualified to make.

As we will see later, it is important to understand exactly what the expert opinions were which the ODA deemed to be impermissible legal conclusions. Gamble's experts were Reed Walker and Ron Nelson. Each produced a lengthy and substantive report, after reviewing the records of all the legal actions at issue here.

Reed Walker explained in detail why Gamble's conduct fell squarely within the bounds of reasonable professional judgment under the circumstances. He summarized his opinion this way:

"Mr. Gamble had an obligation and duty to his client to include critical facts related to subject matter jurisdiction, venue, the UCCJEA, and emergency custody jurisdiction. Mr. Gamble believed [Complainant] procured legally deficient orders based upon legally deficient pleadings submitted by herself and her firm. She counseled, assisted and procured the filing of domestic actions in a county that had no connection to the parties. Mr. Gamble had an obligation to challenge the orders on behalf of his client to the best of his ability, and he did so by filing the memoranda and other related pleadings. He supported his legal positions by citing facts from the record and articulated the relevant Kansas statutes and supporting case law which supported his client's legal positions on the matters. [Complainant] was mentioned in pleadings because she had a familial relationship with [Jane], and, upon Mr. Gamble and his client's information and belief, the factual situation in which [Complainant] and her family found itself had a bearing on his client's situation. Whether and to what extent these matters were relevant, and could have been persuasive to the court, is a question of professional judgment on Mr. Gamble's behalf. Mr. Gamble could have as easily been criticized for omitting these allegations, which might have persuaded the court. There is nothing to support the conclusion that Mr. Gamble did not have 'any' good faith reason to file the memoranda and supporting documentation in the . . . matters. Likewise, there appears to be no evidence that Mr. Gamble has any personal animus toward [Complainant]. Rather, she was involved in facts, as a non-party witness, who also acted as her sister's lawyer, in a highly contested custody case, which facts Mr. Gamble believed were relevant to his client's situation, and, once known to the court, might have persuaded the court. . . . [Complainant] perceived adverse facts and legal arguments as personal attacks. But for her familial relationship to the parties, it would not have been personal. The evidence and arguments offered by Mr. Gamble pertained to legitimate discussion about the family situation, to allow the court to make an informed decision for the best interests of the children."

Ron Nelson shed light on why the tone of Respondent's rhetoric was necessary given the seriousness of the legal and factual issues at hand. He summarized his opinion this way:

> "The proceedings underlying the current complaint against Mr. Gamble were amazingly inappropriate. While it was arguabl[y]appropriate for [Jane] to file a petition for protection in Kansas, even those proceedings should have been undertaken in Utah where the actions alleged to have occurred happened. As the Kansas Court of Appeals decided in a recent decision, when the actions giving rise to a protection case occur in another state and not in Kansas, a Kansas district court lacks personal jurisdiction over the defendant. . . .

> "Ultimately, the Utah judge correctly determined that Utah possessed home state child custody jurisdiction and would exercise that jurisdiction to determine matters of child custody. The judge left in place the Kansas protection order (because as a Utah judge, he had no power over a Kansas proceeding). But in doing so, the Utah court noted that Utah was 'clearly the home state in this instant case' and that 'the state of Kansas initiated temporary jurisdiction knowing [the] parties home state of residence was Utah.'. . .

> "Mr. Gamble vigorously and zealously represented his client in the underlying matter. He was obviously frustrated and indignant over what he saw as a misuse of the court system and complete failure to abide by the clear intentions, language, and directions of the child custody jurisdiction act."

In other words, Complainant *was* forum shopping on behalf of her sister, Complainant's home address *was* relevant, Jane's extended family's circumstances *were* relevant, Gamble's indignance *was* justified, and his zealous advocacy on behalf of John *did not* "go[] too far" or cross "the line"—phrases this court heard repeatedly at oral argument on this matter.

But these conclusions were all deemed to be legal in nature, rather than factual, and so were disallowed. It was only after Gamble was prevented from mounting a meritorious defense to the ethical charges against him that he agreed to negotiate the Summary Submission Agreement that is before us now. Given that the recommended discipline in the Agreement negotiated by the parties is a six-month suspension (stayed during probation), it is safe to assume that the ODA made it clear to Gamble and his disciplinary counsel that it was prepared to seek a harsher penalty should Gamble refuse to accept the Agreement.

I agree with the majority that the Agreement is all we have to go on in this case, and that the parties are bound by any factual admissions included in the Agreement. But this court will only adopt the Agreement when it is "amply sustained by the evidence." *State v. Zeigler*, 217 Kan. 748, 755, 538 P.2d 643 (1975); see also *In re Lober*, 276 Kan. 633, 636-37, 78 P.3d 442 (2003) ("[T]he disciplinary panel's report will be adopted where amply sustained by the evidence, but not where it is against the clear weight of the evidence."); *In re Comfort*, 284 Kan. 183, 190, 159 P.3d 1011 (2007) (examining whether clear and convincing evidence supported the findings); *In re Wonder*, 285 Kan. 1165, 1165-66, 179 P.3d 451 (2008) (relying on *Lober* when respondent took no exceptions); *In re Jones*, 286 Kan. 544, 547, 186 P.3d 746 (2008) (relying on *Comfort*); *In re Owens*, 309 Kan. 80, 88, 431 P.3d 832 (2018) ("Attorney misconduct must be established by clear and convincing evidence.").

A cursory review of the Agreement makes it clear that there are no factual admissions which could even plausibly support the legal conclusions the Agreement purports to stipulate (that is, the existence of a violation of our Rules). And as our precedent makes clear, and the majority admits, parties may not stipulate to legal conclusions. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 400, 266 P.3d 516 (2011) (stipulations as to legal conclusions are ineffective); *In re Gamble*, 319 Kan. at ___, slip op. at 15.

This curious situation was brought about by the parties' actual inability to come to any agreement as to concrete facts that may, indeed, have supported the legal conclusions the ODA desired to present to this court. But the litigation process that might have resolved these questions was short circuited by the ODA's insistence, with the panel's acquiescence, that Gamble would not be permitted to mount a genuine defense. So instead, the parties used our summary submission process to create a pastiche of a real disciplinary case, all while avoiding saying anything at all. A fact that became apparent during the oral argument before us. And to all counsels' credit—and to Gamble's credit—they all made a herculean effort before us to stick to the four corners of the Agreement without admitting anything beyond it. The problem here, however, is that the four corners bound nothing but a vacant lot.

For example, when pressed for any specific facts that might support the stipulated rule violations, Gamble's counsel could not come up with any. He made it clear, in fact, that Gamble and the ODA could not agree on *any* specific facts that might weigh on the legal issues before us. Gamble's counsel was asked, "Counsel, was there any effort among the parties to specifically identify those things that occurred that were over the line" or was this just an agreement that "some things . . . went too far" so that the parties could "go on down the road?" He replied:  "It was very much the latter. For better or for worse, we did make that effort. There wasn't a common ground there, and we needed to get to a resolution that made sense to everyone. So we made that a little vague, I'm afraid." And in keeping with that vagueness, when challenged by the court to identify Gamble's rule violations, his counsel variously described them as Gamble going "overboard"; going "too far"; "stepp[ing] over the line"; and being "too aggressive." And yet, counsel maintained, "I cannot identify specifically the straw that broke the camel's back here."

Here is how Gamble himself put it when he was in front of us:

"I chose to agree to the stipulation, to a violation in this case because I thought it was the best thing to do for not only myself, my family, my practice, my clients that I represent, for a resolution that would allow me to accept responsibility for some of the language that I used, overzealousness you can call it. Being a little too aggressive, not being as sensitive to intricacies and the emotional views that were present in this representation of my particular client."

When asked by the court, "[H]ow . . . would say you engaged in conduct that was prejudicial to the administration of justice?" Gamble replied:

"I believe I caused . . . highly intense emotions, by having to state facts, make arguments, and it put a lot of pressure on people. I didn't do it to be mean or to be spiteful because I thought those facts were relevant to advocating my client's position. . . . I think I went a little too far . . . and I accept that. I'm not perfect."

In similar fashion, counsel for the ODA struggled to identify any specific fact that rose to the level of an ethical violation. Counsel admitted that the arguments and evidence concerning whether "venue and jurisdiction [were] proper under the UCCJEA or the charged family concerns with what was going on in Mexico" were appropriate for Gamble to raise. But the ODA insisted Gamble "did go too far" in making those arguments. Specifically, the ODA cited to Gamble's inclusion of press reports about the murders in Mexico and inclusion of Jane's sister's home address, where Jane was living. Counsel argued:

"There was, therefore, not a necessary reason, a legal purpose for bringing up the social and religious views of the extended family, of attaching newspaper articles, one of which included a family incident from the '70s that is potentially controversial and not from the record before us, linked to what had happened in November with the violent incident. Which seemed to be a random act of violence. There were ways to bring up, not knowing what the confidential address is, because in PFAs, the addresses are confidential

of the protected party. And whether it truly was Wyandotte County without rising to the level of the personal accusations of forum shopping, and there's a level of essentially suggesting that the sister was meddling in the affairs of this family improperly. In emotionally charged cases, it is natural that parties will become very heightened and often times add information that perhaps is only—unless you're living the case, does not seem to be relevant. But this is beyond that because it was very personal, it was potentially controversial, and again the PII is also an important aspect of it, is that the necessity of including her home address. There really was none."

The ODA's claim, then, was that Gamble's arguments and evidence about Jane's extended family in Mexico and about where Jane and the children were living was appropriate, but somehow bringing up press reports about Jane's extended family in Mexico and Jane's actual address were beyond the ethical pale. Why? Because "it was very personal" and was "potentially controversial" and it suggested that Jane's sister and her lawyer were "meddling in the affairs of this family improperly." This is, frankly, a nonsensical argument. And when challenged to defend it by the court, the best counsel for the ODA could do was to say that Gamble mentioned Jane's sister "20 times" which was "an overwhelming amount" and "you can see the link to [the] personal, [and] I think that's when we're talking about an ethical violation."

It is rich indeed that, in order to deny Gamble the opportunity to mount a meritorious defense, the ODA took the position before the disciplinary panel that all of Gamble's expert witness opinions about the necessity, propriety, and relevance of these matters were legal conclusions and thus impermissible. But before us, the ODA insists the precise same claims repeated in the Agreement are somehow stipulations of fact. The blatantly unfair twists and turns of this prosecution and the ODA's outlandish logic— coupled with its grasping at phantom straws to prove up an allegedly broken camel's back—will terrify any member of the Kansas bar. Understandably so.

31

Nonetheless, the majority here, keen to ratify the Agreement, does identify factual stipulations that do exist in the Agreement. First, the majority identifies as a category of fact the "fact" that the Wyandotte County District Court reached certain legal conclusions. The record on that score speaks for itself. The Wyandotte County District Court did make certain legal conclusions. So what? The mere fact that a lower court made legal findings is not an end run around the rule that parties cannot stipulate to legal conclusions. The question begging and circular reasoning on display is enough to make one dizzy.

Leaving these non-fact facts aside, the majority attempts to identify three concrete and distinct *actual* facts which Gamble stipulated to, and upon which the majority hangs its legal conclusion that Gamble violated our Rules. They are: (1) Gamble "made unnecessary and objectionable remarks about [Complainant] and her family, and he attached newspaper articles regarding [Complainant's] extended family. [Gamble] could have effectively argued his client's position without including that information"; (2) Gamble "pushed for an expedited hearing on a motion, and then 'did not call any witnesses or offer any exhibits to further establish the contentions that he made in the second amended omnibus motion. Further, [Gamble] did not withdraw the objectionable statements made about [Complainant]'"; and (3) Gamble "included in a pleading the personally identifiable information (PII) of opposing counsel's home address." 319 Kan. at ___, slip op. at 18-19.

I will address each of these pillars of the majority's case in turn. First, the majority states that Gamble stipulated he "made unnecessary and objectionable remarks about [Complainant] and her family, and he attached newspaper articles regarding [Complainant's] extended family. [Gamble] could have effectively argued his client's position without including that information." 319 Kan. at ___, slip op. at 18. Let's break this down. At the outset, it is clear this statement of "fact" both includes irrelevant information and legal conclusions. For we still do not know what the "unnecessary and

32

objectionable remarks" about Complainant were. Indeed, the characterization of remarks as "unnecessary and objectionable" in this disciplinary case amounts to nothing but legal conclusions with no factual basis. And whether Gamble could have effectively represented his client in some other fashion is completely irrelevant. Of course he could have. There are a thousand-and-one ways to try any case. This fact has no bearing on whether the manner Gamble chose to litigate it was ethical or not.

So finally, we are left with one actual factual stipulation remaining from the majority's first pillar—that Gamble "attached newspaper articles regarding [Complainant's] extended family." 319 Kan. at ___, slip op. at 18. This is true and is a genuine stipulation of fact. Of course, the articles also happened to be about the extended family of Jane and her children, and only involved Complainant because she was Jane's sister! The majority ignores this detail. Evidence and argument concerning the marital dispute—which centered on the relative dangers of taking the children to visit Jane's extended family in Mexico—were directly relevant to the case Gamble was litigating. It *cannot* be the rule that attaching press reports about circumstances directly relevant to a case are *ethical violations* simply because they give rise to strong emotions. And yet, this is what the ODA has proposed, and the majority is willing to turn a blind eye simply because Gamble was effectively coerced into "stipulating" that this is the rule.

The second pillar of the majority's case is the factual stipulation that Gamble "pushed for an expedited hearing on a motion, and then 'did not call any witnesses or offer any exhibits to further establish the contentions that he made in the second amended omnibus motion. Further, [Gamble] did not withdraw the objectionable statements made about [Complainant].'" 319 Kan. at ___, slip op. at 18. Gamble's failure to withdraw unnamed and unknown "'objectionable statements'" is, as above, irrelevant when there is no factual basis to establish that the statements were legally "objectionable" to the extent of a Rule violation. So, the majority is left with Gamble's stipulation to the fact that he "'pushed for an expedited hearing'" and then simply argued his case rather than putting on

additional evidence. Again, this *cannot* be the rule. Every time someone asks for an expedited hearing and then shows up and argues without putting on evidence, they are being *unethical*!? And yet, this is what the ODA has proposed, and the majority is again willing to turn a blind eye simply because Gamble was effectively coerced into "stipulating" that this is the rule.

The third pillar of the majority's case is the factual stipulation that Gamble "included in a pleading the personally identifiable information (PII) of opposing counsel's home address." 319 Kan. at ___, slip op. at 19. True. He did. Opposing counsel just happened to be Jane's sister, the person assisting Jane to secret away John's children to Kansas and shelter them in her home. Opposing counsel's home address in Johnson County also happened to be the residential address of Jane and her children, a fact directly relevant—supremely relevant—to the contested legal questions of jurisdiction and venue in Wyandotte County. And yet, this is unethical? Again, for the third time, this *cannot* be the rule. It simply doesn't pass the blush test. But this is what the ODA has proposed, and the majority for a third time is willing to go along with it simply because Gamble was effectively coerced into "stipulating" that this is the rule.

This case involved a highly contentious family dispute, which in the best of circumstances is hard. And these were not the best of circumstances. Not only did the case entail a complex history including the murder of children in a foreign nation, it featured a mother who absconded with her children to another state to stay with her lawyer sister, who happened to end up representing her and made the questionable decision to file legal actions in that other state (Kansas), and who then ended up as the Complainant against the husband's lawyer when he vigorously defended the cases. But this case also involves big themes about attorney conduct, the nature of our adversarial process itself, and what exactly constitutes the "administration of justice." Kansas Rules of Professional Conduct (KRPC) 8.4(d) (2024 Kan. S. Ct. R. at 430).

34

Of course it is true, as the majority states, that the "administration of justice . . . requires that attorneys act with restraint proportional to the situation before them." 319 Kan. at ___, slip op. at 16. But it is equally true that a desire to quench the "ardor" of dissonant voices in the name of protecting "the very fabric" of "civil society" can lead to ethics rules wielded as a cudgel to suppress dissent and keep the weakest and most disadvantaged members of that society in their place. 319 Kan. at ___, slip op. at 15-16. See *Spevack v. Klein*, 385 U.S. 511, 516, 87 S. Ct. 625, 17 L. Ed. 2d 574 (1967) (acknowledging that the threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion); *Grievance Administrator v. Fieger*, 476 Mich. 231, 361, 719 N.W.2d 123 (2006) (Kelly, J., dissenting) ("The possibility of selective or discriminatory enforcement [of challenged MRPC 3.5(c)] occurring is enhanced when an attorney represents unpopular clients or presents controversial issues."); *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 459 (Tex. 1998) (Baker, J., dissenting) (arguing ethics rule was vague because it utilized a subjective standard of conduct and did "not specify by whose sensitivities a lawyer's actions are judged").

How is a court to tell the difference between the two? I don't deny it is a difficult question—one on which judges of good faith may disagree. But at a minimum, it requires clear facts and precise reasoning. And in this case, the Agreement advanced by the parties denies the court clear facts and short circuits our ability to decide this case with precise reasoning.

Lawyers are expected to take their advocacy seriously and to also refrain from conduct "prejudicial to the administration of justice." KRPC 8.4(d). The majority characterizes this balance as representing "clients with zeal . . . tempered with an appreciation for [the attorneys'] role as stewards of civil society." *In re Gamble*, 319 Kan. at ___, slip op. at 15-16. Rather than expecting lawyers to know this balance when they see it at the risk of losing their livelihood, I suggest that non-disciplinary court

sanctions—such as contempt proceedings or Rule 11 hearings—are a better way for courts to police incivility or stubbornness. *In re Davis*, 318 Kan. 199, 247, 542 P.3d 339 (2024) (Stegall, J., concurring) ("I would give significantly more ethical latitude to attorneys arguing their clients' causes in court. And when lines are crossed, contempt proceedings are a better tool in the judge's tool-belt for maintaining the dignity and decorum of the judicial system."). And even in the case of contempt, wise trial judges will be cognizant of the need to exercise restraint due to the potential for chilling the adversarial process. See *State v. Marine*, No. IK87-12-0847, 1989 WL 40919, at *3 (Del. Super. Ct. 1989) (unpublished opinion) (The court denied the State's motion to hold defense counsel in contempt by observing that the court's "inherent power to discipline attorneys for serious performance deficiencies should not be exercised lightly. [The court is] cognizant of the chilling effect which the threat of overreactive discipline could have on counsel for both the State and the defendant when they undertake to fulfill their respective functions within the adversary system.").

Consider the mythical lawyer—so deeply respected and even beloved not so long ago—who packs a proverbial toothbrush in the briefcase just in case he or she is required to spend a night in lock-up for pushing their clients' causes too hard against official resistance. See *Pack a Toothbrush*, 198 New Jersey L.J. 18 (2009) (Commenting on *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 110, 130 S. Ct. 599, 175 L. Ed. 2d 458 [2009] and noting that lawyers who are "vigilant" when protecting the attorney-client privilege "might . . . need to carry a toothbrush."); *Symposium: Justice in the Spotlight*, 21 T.M. Cooley L. Rev. 337, 345 (2004) (similarly praising New York Times reporters who may be "packing their toothbrushes and heading off to jail" after refusing to disclose their sources pursuant to a court order).

This legal archetype suggests a long-standing recognition that the disputes contested in courts of law are of such importance that we accept a high degree of contentiousness, emotion, stubbornness, upset feelings—and yes, even incivility—simply

because we value so highly the singular role of the adversarial system to resolve society's most difficult and trying conflicts. See *Penson v. Ohio*, 488 U.S. 75, 84, 109 S. Ct. 346, 102 L. Ed. 2d 300 (1988) ("[V]igorous representation follows from the nature of our adversarial system of justice."); *Polk County v. Dodson*, 454 U.S. 312, 318, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981) (Our legal "system assumes that adversarial testing will ultimately advance the public interest in truth and fairness."). It also suggests a recognition that the proper deterrent for uncivil lawyerly behavior is in the hands of individual judges, granted the authority to sanction attorney behavior and even hold unruly counsel in contempt. These are the appropriate remedies for the ills of incivility.

Our ethics code, on the other hand, ought to function as a shield, not a sword. See Bowman, *A Bludgeon by Any Other Name:  The Misuse of "Ethical Rules" Against Prosecutors to Control the Law of the State*, 9 Geo. J. Legal Ethics 665, 671 (1996) (The "formalization of ethical standards into enforceable disciplinary rules, administered by ethics regulators who exercise control over individual livelihoods, can [be] transform[ed] . . . into an offensive weapon . . . ."). The code protects the administration of justice by guaranteeing lawyers are scrupulously truthful in their dealings with our courts—even when those truths are hard and come cloaked with disrespect, contempt, or sheer stubborn insistence. But when the code is wielded as a tool to enforce civility, the potential for abuse is high and the chilling effect on what may be explosive or uncomfortable allegations made on behalf of unpopular people or causes is very real. See *Kentucky Bar Association v. Boling*, 670 S.W.3d 845, 860 (Ky. 2023) (Thompson, J., concurring in part and dissenting in part) (censure of an attorney for a robust closing argument is not appropriate because such discipline could have "a chilling effect on attorneys serving as vigorous advocates"); Communications With Represented Persons, 59 Fed. Reg. 39910-01 (Aug. 4, 1994) (Janet Reno observing that "the heightened threat of disciplinary action that accompanies the expansive application of [ethics] rules has created a chilling effect on prosecutors.").

The idea animating the majority opinion seems to be that attorneys are above all stewards of the "very framework of justice within which litigation operates." *In re Gamble*, 319 Kan. at ___, slip op. at 16. Of course this is true in the abstract. But as high-minded as these words sound, they do beg certain questions. What exactly is the "framework of justice"? Elsewhere I have similarly questioned the idea that other legal actors—judges—ought to be role models who exemplify the dominant cultural mode of genteel behavior. *In re Clark*, 314 Kan. 814, 828-29, 502 P.3d 636 (2022) (Stegall, J., concurring).

Within this "framework of justice," what is the "role" we presume lawyers must "model" lest they fall into ethical disfavor? I fear many of the lawyer-heroes touted in inspirational accounts of long-shot legal victories (common in our profession—a fact we should celebrate) would not survive the kind of ethics inquiry conducted here. Such lawyers would likely have run afoul of recent applications of our ethics code. They were far too insistent that the interests and claims of their clients—usually voiceless and often powerless individuals—will be heard over and against any obstacle. They were not "respectful." They believed civil society is held together by an unrelenting pursuit of the truth, not by tacit agreements among the powerful to be "reasonable."

In my judgment, a pattern has emerged in recent years of the Disciplinary Administrator's office wielding the code as a sword rather than a shield. And beyond that, after a thorough review of the record, I have never seen such a blatantly unfair and illogical prosecution in a disciplinary matter. Given this, it is not surprising that the attorney discipline defense bar has embraced a strategy of falling on that sword to achieve a favorable recommendation from the ODA or to avoid facing additional allegations. See *In re Spencer*, 317 Kan. 70, 85-86, 524 P.3d 57 (2023) (rejecting the jointly agreed to sanction of a 90-day suspension because of the Disciplinary Administrator's faulty legal theory of liability); *In re Huffman*, 315 Kan. 641, 682-83, 509 P.3d 1253 (2022) (stating that harsh criticism of a judge demonstrated "a serious lack of

judgment" but did not rise to the level of an ethical violation under either KRPC 3.5[d] or KRPC 8.2[a]); *In re Todd*, 308 Kan. 133, 136, 418 P.3d 1265 (2018) (rejecting the disciplinary panel's conclusion that respondent had violated KRPC 8.1[b] despite respondent filing no exceptions).

Now, there is no question that bare-knuckle plea bargaining is common and is the prerogative of prosecutors. When respondents admit to facts—even if they do so under undo pressure—they are stuck with those admissions. The existence of this practice does, however, impose a high responsibility on courts to thoroughly evaluate the struck bargain for both factual and legal appropriateness. We are not a rubber stamp. See K.S.A. 22-3210(a)(4) (requiring courts in criminal matters to be "satisfied that there is a factual basis for the plea" before accepting a guilty plea); *State v. Ebaben*, 294 Kan. 807, 812-13, 816, 281 P.3d 129 (2012) (finding an insufficient factual basis for a guilty plea).

This is a case that should never have been prosecuted, let alone result in a six-month suspension. Given this, it is hard to avoid the conclusion that once again our ethics rules are being used to chill and discourage the kind of vigorous advocacy that our system of justice needs to ensure the rights of *all* litigants in our courts of law are protected. More importantly, the Summary Submission Agreement does not actually include any facts that support the legal conclusion the parties agreed to. As such, contrary to the majority, I would find no rule violation on this record.

WALL and STANDRIDGE, JJ., join the foregoing dissenting opinion.