IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,835

In the Matter of SUZANNE VALDEZ,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held April 1, 2025. Opinion filed August 29, 2025. No rule violation; disciplinary proceeding dismissed.

*Kimberly K. Bonifas*, Special Prosecutor, of Morris Laing Law Firm, of Wichita, argued the cause and was on the formal complaint and brief for the petitioner.

*Stephen B. Angermayer*, of Angermayer Law, L.L.C., of Pittsburg, argued the cause and was on the brief for the respondent, and *Suzanne Valdez*, respondent, argued the cause pro se.

PER CURIAM:  This is an attorney discipline proceeding against Suzanne Valdez, of Lawrence, a licensed Kansas attorney admitted to the practice of law in September 1996.

On August 14, 2023, a special prosecutor appointed to represent the Office of the Disciplinary Administrator (ODA) in this matter filed a formal complaint against Valdez alleging multiple violations of the Kansas Rules of Professional Conduct (KRPC). The complaint stemmed from public statements Valdez made in March 2021, while serving as the Douglas County District Attorney. The statements were critical of the district court's plan to hold jury trials at the local fairgrounds during the COVID-19 pandemic and of Chief Judge McCabria specifically. Valdez answered the complaint on September 5, 2023. A panel of the Kansas Board for Discipline of Attorneys held a three-day

1

evidentiary hearing in December 2023. Valdez appeared in person and with counsel at the hearing.

On April 22, 2024, the hearing panel issued its final report, finding there was clear and convincing evidence to conclude Valdez committed two violations of KRPC 3.5(d) (2023 Kan. S. Ct. R. at 396) (undignified and discourteous conduct degrading to a tribunal) by (1) publicly calling Chief Judge McCabria's credibility into question in an official press release, and (2) posting a public message on her personal Facebook page about an "insecure man" that could reasonably be interpreted to refer to Chief Judge McCabria, though she did not specifically mention him by name. Based on this determination, and after considering aggravating and mitigating factors, the panel recommended the court impose a sanction of published censure.

## FACTUAL AND PROCEDURAL BACKGROUND

We quote the panel's relevant findings of fact and conclusions of law, along with its recommendation on disposition, below.

"Findings of Fact

. . . .

"15.     In 2020, Respondent was a professor at the University of Kansas School of Law. She had been a professor at the law school for 21 years. Prior to being a professor at the law school, Respondent had worked at a private law firm in the Kansas City area, and thereafter, for Kansas Legal Services for approximately three and a half to four years.

"16.     While in private practice, Respondent appeared once before Judge James R. McCabria in a divorce hearing. Her client was female. Respondent testified that she

2

felt Judge McCabria was more courteous to the other side and treated the husband more favorably than the wife. She wondered whether this was sexism.

"17.     During the primary election of 2020, Respondent was a candidate for the Democratic nomination for Douglas County District Attorney. She was one of three candidates for the Democratic nomination, another of whom was Charles Branson, the incumbent Douglas County District Attorney.

"18.     Respondent won the Democratic nomination for Douglas County District Attorney during the primary election in August 2020. Since there was no Republican candidate for the office, Respondent was unopposed in the general election on November 4, 2020. Respondent took office as the Douglas County District Attorney on January 11, 2021.

"19.     During all times relevant to the complaint in this matter, the COVID-19 pandemic was a significant factor impacting life in the state of Kansas, including the operation of all judicial branches in the state. After several months of 'shutdown,' the Douglas County judges met and discussed formulation of a plan in September 2020. Their discussion included resumption of jury trials. The plan was approved by the Kansas Supreme Court in October 2020.

"20.     On November 10, 2020, two months before Respondent took office, Judge McCabria, Chief Judge of the Douglas County District Court, released an update concerning the Douglas County Jury Plan Protocols During COVID-19 Pandemic to the Douglas County bar.

"21.     District Attorney Branson was consulted by Judge McCabria during the development of the COVID-19 plan, as he held the office of District Attorney through all of 2020. Respondent did not participate in the development of the COVID-19 plan during 2020.

3

"22.     One aspect of the COVID-19 plan was to hold jury trials in a building at the Douglas County fairgrounds.

"23.     Prior to Respondent taking office as the Douglas County District Attorney, a jury trial schedule had also been developed. Respondent was not involved in the development of the jury trial schedule.

"24.     On December 17 and 18, 2020, the Douglas County District Court held an open house for the local bar and court staff to acquaint themselves with the jury trial facility at the Douglas County fairgrounds. Attendees were encouraged to offer suggestions or comments concerning the location of jury trials at the fairgrounds. Respondent attended the open house on December 18, 2020.

"25.     In late December, a schedule for January 2021 jury trials was posted publicly.

"26.     During the fall of 2020, Respondent's plans to take office in 2021 were complicated by the COVID-19 pandemic and by what she and others described as outgoing Douglas County District Attorney Branson's lack of cooperation with Respondent.

"27.     Branson denied Respondent access to his office until just a few days before Respondent took office as the District Attorney. Branson did not allow Respondent to meet with Branson's attorney[s] or support staff in his office and did not allow Respondent access to personnel files or case files[.] This lack of access to files and personnel information contributed to the difficulty of the Respondent's transition to her position as the new District Attorney.

"28.     Branson did not share with Respondent that the District Attorney's office had been consulting with and giving suggestions to the court about pandemic trial procedures through the fall of 2020.

4

"29.     In fact, on January 4, 2020, just one week before Respondent was to be sworn in, Judge McCabria sent Branson an email asking for his input on his staff's comfort with jury trials. He asked 'I'm just curious whether you have a sense of your attorneys' comfort level with performing their duties in a jury trial setting. The actual risk factor is one thing, the human tolerance factor is another. I'm just curious whether you have any sense and, if so, whether you are willing to share the same for the judges to consider as we decide how to proceed with the current trial schedule.' Respondent was not included in the January 4, 2020, communication, as she had not yet taken office.

"30.     There was a 'spike' in COVID cases in January and February 2021. As a result, trials were moved from the January and February trial dockets to a later date.

"31.     On February 24, 2021, Respondent and other attorneys in her office met with Judge McCabria to discuss upcoming jury trials. Judge McCabria was told that the District Attorney's office was not ready to proceed with jury trials at that time primarily because the office was down five (5) attorneys, there were concerns about COVID protocols, as well as concerns about whether subpoenas could be timely served.

"32.     On March 5, 2021, Respondent and other attorneys from her office met with Judge McCabria and Douglas County District Court Judge Amy Hanley regarding upcoming jury trials. Respondent spoke during this meeting. Her primary concern was regarding security issues related to conducting jury trials at the fairgrounds after one of her employees, Alice Walker, had been using the same bathroom as family members of a violent offender that Walker would be prosecuting.

"33.     Judge McCabria had two meetings in March 2021 to discuss the resumption of jury trials. At the first meeting, Judge McCabria testified that March jury trials were canceled, but that April jury trials were 'likely to go.' At the second meeting, Respondent spoke out against going forward with the April jury trials. Judge McCabria testified that this second March conference was the first time that he had heard Respondent's specific concerns about resuming jury trials.

5

"34.     On March 18, 2021, at 1:58 p.m. Judge McCabria, on behalf of the Douglas County District Court, issued a press release on the planned resumption of jury trials. In the press release, Judge McCabria stated the following:

'*We've consulted with all of the stakeholders, we've sought guidance from health experts throughout the pandemic, and we are confident that whether a trial occurs at the judicial center or at the fairgrounds, this district is fully capable of resuming this important function for the community.*'

"35.     The Respondent had Judge McCabria's cell phone number. Respondent sent a text message to Judge McCabria at 6:59 p.m. that evening that was entered into evidence. It said: 'I plan to issue a statement regarding the court's jury trial plan. The report in the LJW article is false. I was not consulted. My office was told that jury trials would proceed. As I said during our meeting two weeks ago, I have a duty to protect the public. I cannot let the public think I was complicit in this decision to hold trials at the Fairground.'

"36.     Respondent testified that she believed she and Judge McCabria texted back and forth again after this initial text. Though Judge McCabria testified that he did not respond to her later text, he did not testify about whether he responded to the text above.

"37.     On March 22, 2021, Respondent issued a press release regarding the resuming of jury trials. In the press release, Respondent stated the following:

'*The District Attorney's Office was not consulted and is undoubtedly a stakeholder. Importantly, had I or my office been consulted by the District Court, we would have shared our concerns about trials during the COVID pandemic, as well as trying high level felony cases at the Douglas County Fairgrounds in a makeshift courthouse where security is not guaranteed.*'

"38. The March 22, 2021, press release was drafted by Respondent and Deputy District Attorney Josh Seiden.

"39. In response to Respondent's press release of March 22, 2021, Judge McCabria, at 5:47 p.m. that same day, issued a statement by e-mail. Judge McCabria set forth his interactions with Respondent concerning jury trials.

"40. A few hours later, at 7:54 p.m. on March 22, 2021, Respondent sent a private text message to Judge McCabria, which contained the following:

*'You should be ashamed of yourself.*
*We were Told, not consulted.*
*The only reason you commented is because I am a Hispanic female I* [*sic*]*a*
*position of power.*
*I will she* (sic) *the light of truth*
*I will shine the light of truth*
*I will shine the light of truth on everything*'

"41. Judge McCabria did not respond to that March 22, 2021, text message.

"42. On March 23, 2021, Respondent issued a second press release regarding Judge McCabria's statement that the District Attorney's Office was consulted about jury trials.

"43. In that second press release, Respondent emphasized that she was not consulted about the jury trial plan, but rather, she was 'told' about the plan by Judge McCabria. Respondent stated:

*'Chief Judge McCabria did not ask for my advice or for my input regarding the*
*April jury trial plan. To suggest that he and I met personally or consulted about*
*the jury trial plan, or that he invited or asked for my or my office's input is simply*
*false. It is disappointing that Chief Judge McCabria has misrepresented my*

7

*communication with him about the legitimate public safety concerns I have about trying serious high level felony jury trials at the Fairgrounds. Unfortunately, this is yet another example of how an outspoken and honest woman is mischaracterized as untruthful by a male in power.*'

"44.     The March 23, 2021, press release was drafted by Respondent and Deputy District Attorney Seiden.

"45.     That same evening, March 23, 2021, at 5:23 p.m., Judge McCabria sent an email containing copies of emails between his office and Respondent's office about meetings that had occurred regarding jury trials.

"46.     As a result of Respondent's second press release, Judge McCabria testified that he felt the credibility of the court was under attack.

"47.     Respondent posted the disciplinary complaint that was filed against her on the District Attorney website, and she posted her answer to the complaint there as well.

"48.     Judge Hanley testified that she was shocked by the second press release. In her opinion, it impugned the reputation of Judge McCabria and other district court judges, and it impacted the public's perception of the judicial system. Judge Hanley stated that she was a participant in the March 5, 2021, meeting about jury trials which was attended by Respondent, and that Respondent's comments in the second press release about not being consulted were false.

"49.     Respondent testified that while the statements in the second press release were accurate, and that she still stands behind them, in hindsight, she probably would not issue the press releases again.

"50.     Deputy District Attorney Seiden testified that the press releases simply emphasized a difference of opinion between the District Attorney's Office and Judge

McCabria. The difference of opinion centered around being 'consulted' versus being 'told.' Seiden further stated that they probably should not have sent out the press releases.

"51.    On March 23, 2021, Respondent posted on her personal Facebook page, and subsequently on the Douglas County District Attorney's Facebook page, the following statement:

> '*Women of the world-be prepared! If you are hardworking, outspoken, honest, AND in a position of authority, the INSECURE MAN will try to tear you down. Not me, says I! (Fist bump emoji and strong arm emoji followed the statement)*'

"52.    The Facebook post also included Respondent's March 23, 2021, press release wherein Respondent was critical of Judge McCabria.

"53.    Judge McCabria saw the Facebook post and felt the 'insecure man' comment was directed at him.

"54.    Respondent stated that the Facebook post was not directed to, or about, Judge McCabria. Respondent conceded that the Facebook post was probably wrong, as well as stupid, but that nothing she did was unethical.

"55.    Deputy District Attorney Seiden indicated that at first, he thought the Facebook post was about Judge McCabria, but that he later learned from Respondent the 'insecure man' reference was a Taylor Swift lyric.

"56.    Respondent stated during the hearing that she had wanted to apologize to Judge McCabria for what occurred in March 2021.

"57.    However, as of the hearing of this matter approximately two (2) years and nine (9) months later she still had not apologized, notwithstanding the fact that she worked in the same building as Judge McCabria, and that she had numerous professional interactions with him during that period of time.

9

"58.     On March 23, 2021, after the publication of Respondent's second press release, Judge McCabria emailed Disciplinary Administrator Stan Hazlett. Judge McCabria expressed a concern that Respondent's statements were knowingly false or made with reckless disregard as to their truth or falsity.

"59.     Shay Downing, a defense attorney from Lawrence who is also a member of the Board of Discipline, testified by deposition that during a hearing in front of Judge Hanley on March 24, 2021, (which would have been during the time of the issuance of the multiple press releases by Judge McCabria and the Respondent), that Respondent had used the word 'liar' when referring to Judge McCabria. Downing said she made a note to herself that said 'liar!'

"60.     The transcript of the hearing prepared by the court official court reporter did not contain the word 'liar' and Respondent denied calling McCabria a liar in court. Judge Hanley testified that she did not remember hearing Respondent say 'liar.'

"61.     Downing also testified that during a bench-bar meeting on September 2, 2022, that Respondent left the meeting abruptly while Judge McCabria was addressing the group. Downing thought it was disrespectful, but Downing did not know why Respondent left abruptly.

"62.     Ronald Wurtz, an investigator with the Disciplinary Administrator's office testified that he interviewed Respondent. He said that the Respondent denied having called Judge McCabria a liar but later in their interview she said, 'he lies.' Mr. Wurtz did not provide any notes of that conversation or his report. He did not elaborate on what was being discussed and he did not offer any specific context about the discussion when Respondent said, 'he lies.'

"63.     Several of Respondent's previous employees testified about their dissatisfaction of working with or for her. Deputy District Attorney Seiden also testified about working with the Respondent and about the timeline of events.

10

"64.    Alice Walker testified that once in a discussion after a court appearance Valdez had suggested the judge would listen to a male employee more readily than a female. Another time, Respondent had a 'venting session' but Walker did not remember the specific details of that conversation, just that she felt 'uncomfortable.'

"65.    Ms. Walker testified about her stress while working for the Respondent, including describing a 'tightness' in her chest while working for the Respondent that would begin upon arriving at the office and would not subside for 'an hour' after getting home. Ms. Walker applied for a position (the same day of the second press release by the Respondent) and she left the Douglas County District Attorney's office shortly after securing a position with the Office of the Disciplinary Administrator.

"66.    Several judges also testified. Judge Mark Simpson testified that he had worked with the Respondent on a care and treatment task force but that the Respondent had refused to attend a meeting until the disciplinary proceeding was over 'on advice of counsel.'

"67.    Respondent confirmed Judge Simpson's account and testified that her previous lawyer had counseled her not to appear at meetings that were not court hearings with those who were on the witness list and that is why she declined at [*sic*] attend.

"68.    Judge Blake Glover also testified. He joined the bench after the press releases incident and testified that he knew judges were 'taken aback' by Respondent but he was 'not sure he could give specific examples' of problems.

"69.    Judge Sally Pokorny testified that she felt that Respondent's statements to and about Judge McCabria had 'negatively affected' him, though she acknowledged that when asked he would say 'Don't worry about me. I'm fine.' She opined that the incidents had damaged the judiciary because more than one member of the public had asked her when she was out in the community about what was 'going on.' She said that the ability to work collaboratively at the courthouse was damaged because judges were 'gun shy.' As an

11

example, Judge Pokorny said the judges are more likely to communicate with Respondent in writing and to never meet with her alone.

"70.     Judge Stacey Donovan affirmed the testimony from Judge Pokorny that judges communicated with Respondent via email or some writing. Meetings with Respondent required the attendance of at least one other person. All the judges handled interactions with Respondent 'with kid gloves.'

"71.     In August 2023, Respondent proposed that she and Judge McCabria utilize a 'restorative justice' expert to 'work out' what she referred to as 'our disagreements' that led to his filing the disciplinary complaint. Judge McCabria responded that the disciplinary proceeding was already in progress and he did not have decision-making authority there, so he did not think it was appropriate.

"72.     Respondent testified that she did not believe that her actions had interfered with the working relationship between the judges and the District Attorney's Office. She produced several emails that demonstrated that she had some positive communications and productive interactions with the court during the time the disciplinary action was pending.

"Conclusions of Law

"73.     Based upon the Findings of Fact, the Hearing Panel concludes as a matter of law that Respondent violated KRPC 3.5(d) (Impartiality and Decorum of the Tribunal), as detailed below.

"KRPC 3.5(d)

"74.     *A lawyer shall not . . . engage in undignified or discourteous conduct degrading to a tribunal.*

12

"Respondent engaged in undignified or discourteous conduct degrading to Judge McCabria and the legal system when she publicly called Judge McCabria's credibility into question in her second press release. In addition, Respondent's Facebook post about an 'insecure man' was clearly directed at Judge McCabria. Respondent's comments about Judge McCabria were not made in the course of a zealous attorney making a point to a judge about a factual finding or ruling. Rather, they were personal comments that would be inappropriate even during a closed-door meeting with a judge. In this case, the undignified and discourteous comments were made public, published in a newspaper, and placed on social media. Respondent exhibited a reckless disregard for the negative impact her comments would have on others and the judicial system. The Hearing Panel therefore concludes that Respondent violated KRPC 3.5(d). [See, *In re Johnston*, 316 Kan. 611, 520 P.3d 737 (2022); *In re Huffman*, 315 Kan. 641, 509 P.3d 1253 (2022); *In re Rumsey*, 301 Kan. 438, 343 P.3d 931 (2015)][.]

"75.    In the Formal Complaint and during the Formal Hearing, [the] Special Prosecutor alleged numerous other acts or comments by Respondent that purportedly rose to the level of additional separate KRPC violations. Respondent denied that any of her acts or comments were unethical or violated the KRPC. Respondent and her counsel both acknowledged that some comments were ill-advised and unprofessional.

"76.    Judge McCabria stated that Respondent was unprofessional on numerous occasions in his courtroom including 'huffing and puffing' in the courtroom. Douglas County District Court Judge Stacey Donovan testified Respondent's conduct eroded the public's trust in the judicial system. Judge Hanley stated that during the March 5, 2021, meeting between Respondent and Judge McCabria, she had never seen an attorney treat a judge like Respondent treated Judge McCabria. She further stated Respondent was hostile and antagonistic towards Judge McCabria.

"77.    Further, Investigator Ronald Wurtz testified that during his interview of Respondent that she commented to him that Judge McCabria 'lies', while at the same time denying that she called him a liar during the court proceeding or in the courtroom.

13

"78.     The Hearing Panel does not find that the special prosecutor has met the burden of proof to support that Respondent's unprofessional conduct constitutes additional KRPC violations beyond the KRPC 3.5(d) violation addressed above.

"*American Bar Association Standards for Imposing Lawyer Sanctions*

"79.     In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (Standards). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"80.     *Duty Violated.* Respondent violated her duty to the legal system, the legal profession, and the public as a result of her comments about Judge McCabria in the second press release and in her Facebook post.

"81.     *Mental State.* Respondent knowingly violated her duties. Respondent had time to reflect on and consider the language in her second press release and in her Facebook post before issuing both.

"82.     *Injury.* As a result of Respondent's misconduct, Respondent caused actual injury to the legal system, the legal profession and the public. She impugned Judge McCabria's character in a publicly issued press release and by referring to him as an 'insecure man.' Though she did not specifically refer to him by name, her name-calling could reasonably be interpreted to refer to Judge McCabria.

"Aggravating and Mitigating Factors

"83.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel found the following aggravating factors present:

14

"84.    *A Pattern of Misconduct.* Respondent engaged in two (2) separate violations of KRPC 3.5(d) with the publication of the second press release and with her Facebook post.

"85.    *Refusal to Acknowledge Wrongful Nature of Conduct*. Respondent denied any KRPC violations, choosing instead to characterize her comments as unprofessional.

"86.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel found the following mitigating circumstances present:

"87.    *Absence of a Dishonest or Selfish Motive*. Respondent's misconduct does not appear to have been motivated by dishonesty or selfishness.

"88.    *Previous Good Character and Reputation in the Community Including Any Letters from[]Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* Respondent offered five (5) letters of support of her good character and reputation.

"89.    *Delay in Disciplinary Proceedings*. The conduct giving rise to the KRPC violations found by the Hearing Panel arose in March 2021. The Formal Complaint was filed August 14, 2023. The Formal Hearing was held on December 18, 19, and 20, 2023. The Panel agreed to a continuance of the Formal Hearing from October to December 2023, requested by Respondent's counsel for personal reasons, so no material delays in the proceedings were the fault of Respondent.

"90.    *Remorse.* During the Formal Hearing, Respondent expressed remorse, and indicated she was sorry, regretful, and humiliated.

"91.     While not specifically listed in Standard 3 as mitigating factors, the Hearing Panel believes two (2) factors may have contributed to the ill-advised way Respondent responded to Judge McCabria. First, as stated previously, the COVID-19 pandemic completely disrupted the normal operations of the court system, causing stress and uncertainty that may have contributed to the impetuous and regrettable tone of her statements. Second, Respondent and Deputy District Attorney Sieden testified that District Attorney Branson's failure to cooperate during the transition period frustrated Respondent, causing her to be less prepared for the difficult situation (COVID-19 challenges and being understaffed) when she assumed office in January 2021. The Hearing Panel is unsure of the degree these two (2) issues may have contributed to Respondent's intemperate comments, but could not ignore the possibility that the stress of these two incidents contributed to the poor conduct.

"92.     In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

> '7.2     Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public or the legal system.
>
> '7.3     Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendations of the Parties*

"93.     [The] Special Prosecutor recommended that Respondent be suspended for one (1) year. Respondent denied any KRPC violations and did not recommend any discipline be imposed, although, in Respondent's opening statement to the Hearing Panel,

16

her counsel indicated that if any violations were found, the appropriate discipline should be public censure.

"*Recommendations of the Hearing Panel*

"94.     The Hearing Panel considered and weighed the evidence to make findings upon the 'clear and convincing' burden of proof. While the panel highly respects the many witnesses who testified (including several Douglas County judges), much of the testimony was either vague or conclusory or, as with Ms. Downing's testimony, not captured by the court reporter. Had the standard of proof been different, the panel's factual findings may have been different.

"95.     The Hearing Panel notes again that the Respondent's behavior occurred during COVID shutdowns which caused some new and unique challenges for the court system and the District Attorney's office. The Hearing Panel also notes that the Respondent's transition to the Office of the District Attorney was not smooth and that the Respondent was not privy to some of the communications between the court and former DA Branson. While not excusing any of the Respondent's behavior, the Hearing Panel believes that those circumstances do offer some explanation and context which should be taken into account in formulating their recommendations regarding sanctions. Accordingly, based upon the Findings of Fact, Conclusions of Law and the Standards listed above, the Hearing Panel unanimously recommends that Respondent be censured. The Hearing Panel further recommends that the censure be published in the Kansas Reports.

"Costs are assessed against Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

Neither party filed exceptions to the findings of fact or conclusions of law; Valdez contested only the recommended discipline. See Supreme Court Rule 228(f)(1) (Parties can contest a hearing panel's recommendation of discipline without filing an exception.) (2025 Kan. S. Ct. R. at 281). For the reasons explained below, we adopt the panel's

17

factual findings but reject its legal conclusion that Valdez' statements violated KRPC 3.5(d). Therefore, we impose no discipline and dismiss these proceedings accordingly.

## DISCUSSION

In an attorney disciplinary proceeding, we consider the evidence, the panel's findings, and the parties' arguments to determine whether KRPC violations exist and, if they do, what discipline should be imposed. *In re Spiegel*, 315 Kan. 143, 147, 504 P.3d 1057 (2022). Attorney misconduct must be established by clear and convincing evidence, which is evidence that causes the factfinder to believe the truth of the facts asserted is highly probable. Supreme Court Rule 226(a)(1)(A) (2025 Kan. S. Ct. R. at 275); *In re Spiegel*, 315 Kan. at 147. Thus, we will adopt the panel's factual findings only when sustained by such evidence. *In re Garcia*, 282 Kan. 721, 721, 147 P.3d 132 (2006). As to the panel's legal conclusions, we review them de novo—even when a party has not objected by filing an exception or otherwise admits to a violation; in other words, we form our own legal conclusions. *In re Clark*, 314 Kan. 814, 822, 502 P.3d 636 (2022) ("Ultimately, the question whether a respondent violated a rule is a question for this court and subject to de novo review."); *In re Gamble*, 319 Kan. 680, 690, 558 P.3d 290 (2024) (The parties' "agreements on conclusions of law are not binding on this court. We make our own conclusions."). Finally, the panel's recommendation of discipline is advisory only and not binding on this court. *State v. Dixon*, 233 Kan. 465, 470, 664 P.2d 286 (1983) (disciplinary board's recommendations advisory only).

The parties did not contest the panel's factual findings, and we find no cause to differ after reviewing the record. We therefore adopt the panel's factual findings as supported by clear and convincing evidence.

Based on these findings, the hearing panel concluded Valdez twice violated KRPC 3.5(d) when she "engaged in undignified or discourteous conduct degrading to Judge McCabria and the legal system" by publicly calling the chief judge's credibility into question in her second press release and by posting a public message on her personal Facebook page about an "insecure man" that could reasonably be interpreted to refer to Chief Judge McCabria, though she did not specifically mention him by name. To assess the panel's legal conclusion, we must consider the language of the rule.

KRPC 3.5(d) states that "[a] lawyer shall not . . . engage in undignified or discourteous conduct degrading to a tribunal." (2025 Kan. S. Ct. R. at 388). The panel concluded Valdez violated this rule by conduct "degrading to Judge McCabria and the legal system." But the rule specifically prohibits conduct degrading to a *tribunal*. KRPC 1.0(n) defines "tribunal" as "a court, an arbitrator in a binding arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity." (2025 Kan. S. Ct. R. at 318). Given this express definition, we interpret KRPC 3.5(d) to prohibit a lawyer from engaging in undignified or discourteous conduct degrading to a court or other arbiter when the court or other arbiter *is acting in an adjudicative capacity*.

Our interpretation aligns with the purpose of KRPC 3.5—promoting impartiality and decorum in legal proceedings—to protect the legitimacy of the tribunal. This purpose is reflected in the rule's specific prohibitions against certain attorney misconduct: KRPC 3.5(a) (attempt to improperly influence a judge, official, or employee of a tribunal by a gift or loan of value); KRPC 3.5(b) (ex parte communications with acting or prospective members of the jury); KRPC 3.5(c) (ex parte communications with the judge or other presiding official); and KRPC 3.5(d) (conduct degrading to a tribunal).

19

And our prior caselaw applying Rule 3.5(d) agrees with this narrow interpretation of "tribunal." See, e.g., *In re Davis*, 318 Kan. 199, 233-38, 542 P.3d 339 (2024) (violation when lawyer repeatedly argued, interrupted, and talked over judge during a hearing, calling a ruling an injustice to be ashamed of and claimed the court was "railroad[ing]" the lawyer's client); *In re Johnston*, 316 Kan. 611, 665, 520 P.3d 737 (2022) (violation when lawyer accused the bench, bar, and other officials of collusion and racketeering, without support, during lawyer's personal family law case); *In re Romious*, 291 Kan. 300, 303, 309, 240 P.3d 945 (2010) (violation when lawyer was rude and disruptive towards court personnel, shouted profanities at court staff, accused judge of being a pedophile, and resisted U.S. Marshals' efforts to escort lawyer from premises); *In re Eckelman*, 282 Kan. 415, 415-19, 421-22, 144 P.3d 713 (2006) (violation when lawyer used profanity in criticizing the legal proceedings to the judge and court staff and repeatedly accused the judge of speaking improperly with jurors and being prejudiced against the lawyer and client); *In re Rathbun*, 275 Kan. 920, 926-27, 930, 69 P.3d 537 (2003) (violation when lawyer became angry with judge for not ruling on a desired issue and behaved in an undignified and discourteous manner to the court during a juvenile offender hearing); *In re Berry*, 274 Kan. 336, 340-42, 346, 352-53, 50 P.3d 20 (2002) (violation when lawyer interrupted judge and said "'I don't care if you're a Judge or not . . . that is totally improper what you're doing here,'" called judge's ruling "contemptuous," and accused judge of racial bias during hearing); *In re Gershater*, 256 Kan. 512, 513-15, 517-18, 886 P.2d 343 (1994) (violation when lawyer representing client in landlord tenant dispute sent client a letter regarding notice of default judgement, in which the lawyer falsely accused the judge of outrageous and unethical behavior).

Further, the corresponding ABA Model Rule of Professional Conduct, MRPC 3.5, also focuses on lawyer misconduct that could impair an actual legal proceeding under the authority of a court or other adjudicatory body. Though MRPC 3.5(d) refers to conduct

20

*disrupting* rather than *degrading* a tribunal, the relevant comments equate disruptive conduct to "abusive or obstreperous conduct" and specify that the duty to refrain from such conduct "applies to *any proceeding* of a tribunal." (Emphasis added.) Comments [4], [5]. In *In re Davis*, we found persuasive the comment to MRPC 3.5(d), which explains the rule's purpose:

> "'The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.'" 318 Kan. at 234 (quoting MRPC 3.5[d], Comment [4]).

It is clear from the expressed purpose of MRPC 3.5(d) that this rule is intended to preserve courtroom decorum for the fair and impartial administration of justice—not to restrain lawyers from ever criticizing the court in a manner that could be considered rude or offensive.

After reviewing the panel's factual findings, the record, the relevant caselaw, and the ABA Model Rules, we conclude that Valdez' conduct, which formed the basis for the disciplinary complaint, did not violate KRPC 3.5(d). Her press release—though sharply critical of the district court's decision to hold jury trials at the local fairgrounds during the COVID-19 pandemic and of Chief Judge McCabria's characterization of her office's involvement (or lack thereof) in the development of that plan—was not made in the context of an actual legal or other adjudicative proceeding. Similarly, her Facebook post, while arguably disparaging of the chief judge both personally and professionally, was

21

also made outside an adjudicative setting. Given these facts, we view her commentary as speech and expression that falls beyond the limited scope of KRPC 3.5(d) and reject the panel's broad reading of the rule as extending to extrajudicial commentary about courts or judges, even when the comments are unwise, inappropriate, or offensive.

CONCLUSION

Having determined that Valdez did not violate KRPC 3.5(d) by her statements, as alleged in the complaint, we impose no discipline and dismiss this matter accordingly.

It is Ordered that respondent shall not be assessed any costs of these proceedings and that this opinion be published in the official Kansas Reports.

WILSON and WALL, JJ., not participating.
NANCY E. PARRISH and MERYL WILSON, Senior Judges, assigned.

* * *

STEGALL, J., concurring: Back in 2021 at the height of the COVID-19 pandemic, the respondent Suzanne Valdez, a publicly elected official—the Douglas County District Attorney—made some intemperate comments about the chief judge of the district. Now, years later, after countless news stories, public outcry, lawyers hired, weeks and months of investigations and hearings, and a subsequent election for Douglas County District Attorney at which the respondent was unseated in part because of these charges—here we are. Was it worth it? No, it was not.

22

The Office of Disciplinary Administrator (ODA) charged Valdez with numerous violations of the Kansas Rules of Professional Conduct (KRPC) under both KRPC 3.5(d) (undignified or discourteous conduct degrading to a tribunal) and KRPC 8.2(a) (statements that the lawyer knows to be false or with reckless disregard as to their truth or falsity concerning the qualifications or integrity of a judge). (2025 Kan. S. Ct. R. at 388, 424). According to the Complaint, Valdez violated these rules when she:

- Issued a press release contradicting Chief Judge James McCabria's statement that all stakeholders had been consulted in coming up with the plan to hold jury trials at the fairgrounds.
- Sent text messages to Judge McCabria stating,
  - "'You should be ashamed of yourself. We were TOLD, not consulted. The only reason you commented is because I am a Hispanic female I [*sic*] a position of power. I will she [*sic*] the light of truth[.] I will shine the light of truth[.] I will shine the light of truth on everything[.]'"
- Issued a second press release where she reiterated that Judge McCabria had not sought her advice regarding the jury trial plan and that "'[i]t is disappointing that Chief Judge McCabria has misrepresented my communication with him about the legitimate public safety concerns I have about trying serious high level felony jury trials at the Fairgrounds. Unfortunately, this is yet another example of how an outspoken and honest woman is mischaracterized as untruthful by a male in power.'"
- Shared the second press release to her personal Facebook page with the caption, "'Women of the world- be prepared! If you are hardworking, outspoken, honest, AND in a position of authority, the INSECURE MAN will try to tear you down. Not me, says I!! (fist bump emoji and strong-arm emoji).'"

23

- Sent an ex parte email to Judge McCabria and Judge Amy Hanley where she did not include a defendant's counsel.
- Stated in a hearing before Judge Hanley that Judge McCabria had lied and had violated the ethical rules.
- Yelled, cursed, bad-mouthed, and name-called Judge McCabria to attorneys in her office.
- Created a negative work environment such that all attorneys in her office except one quit within a few months.
- Told the disciplinary investigator that Judge McCabria was a liar while denying she had called him a liar previously.
- Called Judge McCabria "'sexist'" in an email to the ODA.
- Told an individual with the ODA to ask a former attorney with the district attorney's office "'how sexist McCabria is,'" but the former attorney stated the opposite was true.
- Stated at a hearing before Judge McCabria "'. . . honestly in light of the Court's willingness to grant expungement in these types of cases, as we've seen with *Jarrett—State of Kansas vs. Jarrett Rodgers*, I don't really feel like we can—having a hearing would only further traumatize the victim.'"
- Sent an email to Judge McCabria during a back-and-forth on rescheduling expungement cases stating,
  - "'Judge McCabria,
    Please do not lecture me about professional courtesy when you have not shown any to me as DA. I will take time from my CLE to attend the June docket, but I will be sure to address this lack of professional courtesy on your part as public interest in judicial accountability grows.'"
- Walked out during a bench-bar meeting while Judge McCabria was speaking, making angry comments under her breath.

- No-showed at a meeting with Judge Simpson because Judge Mark Simpson's name appeared in the investigation report on this disciplinary matter.
- Refused to participate in a case review with Judge McCabria and Judge Pro Tem Blake Glover over traffic case backlog due to an article being published about this disciplinary proceeding.

Following a fully contested hearing, the panel found most of these charges were not supported by clear and convincing evidence. Specifically, the panel ruled that the ODA had not proven any violations of KRPC 8.2(a) and found only two discrete violations of KRPC 3.5(d)—that Valdez had been "undignified or discourteous" toward Chief Judge McCabria when she said he was an "insecure man" and when she called his "credibility into question." A reasonable inference might be drawn that the panel was not impressed with the ODA's case but, in Solomonic fashion, decided to throw a bone its way.

From this, we can easily deduce that none of Valdez' comments were proven to be untrue or made with reckless disregard as to their truth. This includes the two comments found to be "undignified or discourteous." Now, given my personal experience with Chief Judge McCabria, I find the entire litany of allegations leveled at him by Valdez to be silly at best and scurrilous at worst—but this is entirely beside the point. Can we really say that truthful statements (or statements that cannot be proven untrue) can *still* be unethical if they are discourteous? If a judge acts in an undignified manner, is commenting on his or her behavior unethical? See *In re Clark*, 314 Kan. 814, 822, 502 P.3d 636 (2022) (Stegall, J., concurring) ("[The judge's] behavior was embarrassing, foolish, and grossly immoral . . . .").

25

I have said it before, but it bears repeating—the practice of law is not a finishing school for debutants preparing for their first dance. See *In re Gamble*, 319 Kan. 680, 695, 558 P.3d 290 (2024) (Stegall, J., dissenting) ("'There's no crying in baseball!' So intoned Tom Hanks' character in the film *A League of Their Own* [Columbia Pictures 1992]. It is a message the Kansas bar and bench—and our Disciplinary Administrator's office— should consider."); *In re Davis*, 318 Kan. 199, 247, 542 P.3d 339 (2024) (Stegall, J., concurring) ("[I]t does the judicial branch no favors to present publicly with a collective glass chin."). Miss Manners has much to commend her within a polite and respectful society, but we are not her enforcement division.

This is not, however, what is most important about today's case. There is much more at stake—the beating heart of our democratic process—unconstrained political speech. There is a disturbing trend in our body politic to turn "ethics" into a political widow maker—a recently dislodged calcium deposit stalking the arterial system of our campaigns, elections, and government—threatening a blockage at any time. The rallying cry of, "You can't say that!" accompanied by looming threats of punishment is a kind of atherosclerosis—a narrowing of our political arteries—that I cannot countenance.

For it cannot pass our notice that this entire process was aimed squarely at punishing political speech. Even after (perhaps especially after) Valdez was acquitted by the panel of the most serious charges (and now, finally, is absolved of all guilt by this court), we cannot turn a blind eye to the reality that this attorney disciplinary process played a starring role in an important public election in Douglas County. Without question it impacted the outcome—if perhaps not the ultimate victor. At a minimum, it affected the point spread, as Valdez received only 9% of the vote in the Democratic primary. Conde*, Dakota Loomis unseats DA Suzanne Valdez in landslide primary win,*

26

Lawrence Journal-World (Aug. 6, 2024). Is this what we, as the policy setting body for attorney discipline and ethics enforcement, really want? I for one decidedly do not.

Today, the majority finds that Valdez did not violate our ethics rules on what amounts to a technicality. That is, the majority has decided Valdez' comments were not made in the context of an actual legal or other adjudicative proceeding and therefore were not "degrading to a tribunal." *In re Valdez*, 321 Kan. ___, ___, slip op. at 21-22. I find this reasoning to be a pedantic bit of *couper les cheveux en quatre*—the distinction drawn is overly fine. I agree with Justice Rosen's dissent that certainly the subject matter of the spat between Valdez and Chief Judge McCabria concerned the "tribunal" of the Douglas County District Court. The issue, after all, was how and when trials were to be conducted during the pandemic. See 321 Kan. at ___, slip op. at 39 (Rosen, J., dissenting) ("[T]he rules plainly contemplate a prohibition on conduct that degrades the court regardless of what function the court is performing."). So while I concur in the outcome reached by the majority—that Valdez violated none of our Rules of Professional Conduct—my reasoning differs dramatically.

To put my conclusion bluntly, I would find that KRPC 3.5(d) and KRPC 8.2(a) do not apply to political speech. And while I will discuss First Amendment law below, I ground my decision not in a constitutional prohibition, but rather squarely in this court's discretionary power to make substantive policy when enforcing our Rules. That is, I would expressly limit the application of KRPC 3.5(d) and KRPC 8.2(a) not because the First Amendment requires this—though it may—but because such a policy is necessary to vindicate the free speech values that undergird and inform both the First Amendment and the functioning of our democratic system of self-government.

Let's begin our discussion with a cautionary tale.

The modern record is replete with current politician/lawyers who are critical of the judiciary in "discourteous" ways. Politicians from both sides of the political aisle (who also happen to be lawyers subject to state ethics codes) routinely criticize both judges and their opinions. These range from relatively mild critiques to the more provocative. See Myers & Fox, *Utah Sen. Mike Lee introduces bill to stop district court judges from "usurping" Pres. Trump*, ABC4 (Mar. 28, 2025) (quoting Senator Lee as saying: "'America's government cannot function if the legitimate orders of our Commander in Chief can be overridden at the whim of a single district court judge.'"); Goldsberry, *Tom Cotton calls upon Supreme Court to "rein in rogue federal judges,"* Washington Examiner (Apr. 21, 2025) (quoting Senator Cotton as saying: "'This far-left Obama judge in Maryland is now demanding the president somehow sit down with a foreign leader and come to terms to return an MS-13 wife beater.'"); Blanchet, *Adam Schiff Issues Stark Warning For Supreme Court On Trump's "Bogus" Immunity Claim*, HuffPost (Mar. 18, 2024) (quoting Senator Schiff as saying: "It would be a terrible decision . . . it would also just further discredit this partisan and reactionary court."); Robinson, *Why Did Texas Sen. Ted Cruz Criticize Judge Sonia Sotomayor During Senate Hearing on Universal Injunctions?*, Texas Lawyer (Feb. 25, 2020) (quoting Senator Cruz referring to a Justice Sotomayor dissent as "'an arsonist complaining about the noise from the fire trucks'"); Crawford, *Alito Winces as Obama Slams Supreme Court Ruling*, CBS News (Jan. 28, 2010) (describing President Obama's critique of *Citizens United v. F.E.C.*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 [2010], in his State of the Union Address).

So back in 2020 when Senate Minority Leader Chuck Schumer gave a fiery speech on the steps of the U.S. Supreme Court expressing his view of the Court revisiting *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), his rhetoric was unrestrained. Senator Schumer called out two justices in particular, stating "Justice

28

Kavanaugh and Justice Gorsuch, you have unleashed a whirlwind, and you will pay the price." Moreno, *Schumer Warns Kavanaugh and Gorsuch they will "pay the price,"* The Hill (Mar. 4, 2020). And these comments resulted in a complaint filed with the New York Attorney Grievance Committee. The complaint argued that Senator Schumer had violated Rule 8.4 of the Rules of Professional Conduct for the New York State Unified Court System, which prohibits engaging in conduct that is prejudicial to the administration of justice. *Ethics & Bar Complaints Filed Against Sen. Schumer on Supreme Court Threats,* Nat'l L. & Pol'y Ctr. (Mar. 6, 2020).

But commentators on both the left and the right nevertheless expressed doubt that such rhetoric merited going after Senator Schumer's license to practice law. See Turley, *No, Schumer Did Not Violate Legal Ethics In His Threat Against The Court*, Res Ipsa Loquitor Blog (Mar. 13, 2020) ("[I]f the New York bar is claiming the authority to monitor such reckless political comments, it would delve deeply into the regulation of political speech. It would also invite arbitrary and partisan enforcement by the Bar."). See also Patrice, *NY Bar Properly Rolls Its Eyes At Ethics Complaint Against Chuck Schumer*, Above The Law (Aug. 7, 2020).

For its part, the New York Attorney Grievance Committee declined to take any action against Senator Schumer, stating that

> "[w]hile these comments were certainly concerning, the Attorney Grievance Committee (AGC) is cautious about disciplining attorneys, whether local attorneys or public officials, for comments that may be protected by the First Amendment. In addition, the AGC is mindful not to wade into political controversies that would result in an endless onslaught of retaliatory complaints by opposing parties." *Matter of Schumer,* No. 2020.0656 (N.Y. Attorney Grievance Comm., Aug. 5, 2020).

Senator Schumer later apologized and wryly observed: "I'm from Brooklyn. We speak in strong language." *Sen. Schumer Says He Didn't Threaten Supreme Court Justices: "I'm From Brooklyn. We Speak in Strong Language,"* CBS News (Mar. 5, 2020).

Though Senator Schumer escaped reprisal, examples abound of lesser-known lawyers who find themselves in hot ethical water for speaking "Brooklynese." For example, a Florida attorney agreed to settle his disciplinary case with a public reprimand after calling a judge an "evil, unfair witch" in his blog. Cassens Weiss, *Lawyer Agrees to Reprimand for Blog Tirade About Judge*, ABA Journal (June 11, 2008). And one can understand why the attorney chose to settle his case after one sees how other disciplinary cases can go in similar circumstances. See, e.g., *Cleveland Metro. Bar Assn. v. Morton*, 166 Ohio St. 3d 266, 269, 276, 185 N.E.3d 65 (2021) (attorney suspended for one year for failing to act with "dignity and civility" following accusations that judges apply "politics, not law" in deciding tax valuation cases); *In re Marshall*, 528 P.3d 653, 669 (N.M. 2023) (attorney was indefinitely suspended after accusing a judge of intentionally failing to disclose a previous relationship with a party and ignoring the law in order to "fix" the case); *Matter of Dinhofer*, 257 A.D.2d 326, 327, 690 N.Y.S.2d 245 (1999) (attorney suspended for three months for comments during a telephone conference such as "[t]his is blatantly corrupt. You are sticking it to me every way you can.").

Contrary to what some think, judicial sensitivity to criticisms and discourtesies does not enhance respect for the judiciary—it undermines it. "The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion." *Bridges v. California*, 314 U.S. 252, 270, 62 S. Ct. 190, 86 L. Ed. 192 (1941). Indeed, because "it is a prized American privilege to speak one's mind"—even when not in "perfect good taste"—any "enforced silence . . . in the name of preserving the dignity of the bench, would probably

engender resentment, suspicion, and contempt much more than it would enhance respect." 314 U.S. at 270-71.

Some courts seem to intuit this fact. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1057-58, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) (Criminal defense attorney suggested in a press conference that undercover officers, rather than his client, were more likely to have committed the accused theft. While the Nevada State Bar sought discipline, the United States Supreme Court held that "[a]t the very least, however, we can say that the Rule which punished petitioner's statements represents a limitation of First Amendment freedoms greater than is necessary."); *In re Green*, 11 P.3d 1078, 1080 (Colo. 2000) ("We conclude that the First Amendment prohibits disciplining Green on the basis of his communications with the judge because the communications did not make or imply false statements of fact."); *In re Maridon*, No. 85606, 2023 WL 4102078, *4 (Nev. 2023) (unpublished opinion) ("'[W]e view the remarks here examined to be extremely bad form while in the same breath we hold them to be protected.'"); *State ex rel. Oklahoma Bar Assn. v. Porter*, 766 P.2d 958, 969 (Okla. 1988) ("In the absence of a showing of falsity the statement must be held to be speech on vital issues of self government protected by the First Amendment."); *State ex rel. Okla. Bar Ass'n v. George*, 508 P.3d 975, 978-79 (Okla. 2022) (applying *Porter* and declining discipline beyond that imposed by Tenth Circuit).

The caselaw suggests that while there may be a judicial awareness of the need to tread carefully around the intersection of speech and ethics, some courts feel hamstrung by the language of most ethics codes which spring from the model rules promulgated by the American Bar Association (ABA). The situation is exacerbated by the infusion of subjectivity into the actual text of the rules. How one understands words and concepts like "discourteous" are so conditioned by personal values, upbringing, culture, socio-

economic status, and the like, as to be virtually impossible to enforce in an objective and even-handed way. These are the hallmarks of a legal milieu that will inexorably lead to arbitrary enforcement decisions, double standards, and punishments meted out to unpopular people and opinions.

Moreover, the ABA has in recent years forfeited its reputation as a neutral player in the realm of attorney ethics. We owe its conception of "discourteous" behavior no deference. I am reminded of the recent kerfuffle created by the ABA a few years ago when it attempted to bully states into adopting a revised version of its Model Rule 8.4(g), which would have made it unethical to engage in speech judged to be "harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law." Model Rules of Pro. Conduct r. 8.4(g) (Am. Bar Ass'n 2016). The ABA made it clear that among the conduct prohibited by this change was "harmful verbal . . . conduct that manifests bias or prejudice towards others" and reached so far as to sweep up speech occurring in "social activities" if they were somehow related to the practice of law. Model Rule 8.4(g), cmts. 3, 4.

This spawned a widespread outcry across the legal profession as commentators sounded the alarm—the ABA was trying to regulate lawyer speech at an unprecedented level. Influential legal commentator and professor Eugene Volokh observed:

> "[S]ay that you're at a lawyer social activity, such as a local bar dinner, and say that you get into a discussion with people around the table about such matters—Islam, evangelical Christianity, black-on-black crime, illegal immigration, differences between the sexes, same-sex marriage, restrictions on the use of bathrooms, the alleged misdeeds of the 1 percent, the cultural causes of poverty in many households, and so on. . . . The state bar, if it adopts this rule, might thus discipline you for your 'harassment.' And, of course, the speech restrictions are overtly viewpoint-

based: If you express pro-equality viewpoints, you're fine; if you express the contrary viewpoints, you're risking disciplinary action." Volokh, *A speech code for lawyers, banning viewpoints that express "bias," including in law-related social activities?*, Volokh Conspiracy, Washington Post (August 10, 2016).

Former United States Attorney General Ed Meese was so alarmed he penned an open letter to the ABA condemning the proposed change. In it, Meese argued that

"[t]his proposed rule violates the very spirit—in addition to the text—of the First Amendment's guarantees, and transgresses the most fundamental principles that American lawyers have adhered to since 1776 regarding a lawyer's right to express and live out his own belief system, as well as the right to full and zealous legal representation on behalf of any client, including (and indeed, especially) those whose views diverge from political correctness or modern social orthodoxy." Letter from Edwin Meese III, 75th Attorney General & Kelly Shackelford, CEO and President, First Liberty Institute, to Patricia Lee Refo, Chairperson, ABA House of Delegates (Aug. 5, 2016).

Meese went on to suggest that "branding certain opinions" as "so deplorable that they should trigger draconian sanctions" is "noxious to the foundational principles of a free society." And that "hostility to those who deviate from the approved orthodoxy resembles the laws and tactics of oppressive regimes around the globe . . . this proposed rule borders on fascism." Letter from Meese & Shackelford to Refo.

The controversy generated a slew of law review articles, CLEs, and other panicked commentary from attorneys across the country. At least four state attorneys general officially opined that the proposed rule was unconstitutional. Blackman, *ABA Model Rule 8.4(g) in the States*, 68 Cath. U. L. Rev. 629, 630-33 (2019) (Texas, South Carolina, Louisiana, and Tennessee). And an overwhelming majority of the states—including Kansas—refused to adopt the change, in what amounted to a remarkable rebuke to the

ABA by the profession as a whole. Long, *Discrimination, Model Rule 8.4(g), and the ABA's Quixotic Quest for Uniformity*, 81 Wash. & Lee L. Rev. 1551, 1555 (2024) ("Only two states [Vermont and New Mexico] have adopted the rule in the form promulgated by the ABA.").

Ironically, Valdez was regarded as an expert on attorney ethics at the time and presented numerous CLEs on the very topic at hand—threats to free speech coming in the form of ethical rules. In them, she warned of the constitutional implications of the proposed rule, observing that it potentially "targets religious beliefs and expression by attorneys, . . . punish[es] attorneys for membership in disfavored groups, . . . [and] may raise substantial free speech concerns if applied to statements made by attorneys in connection with their practice of law." Valdez, *Recent Developments in Ethics:  New ABA Model 8.4(g):  Is this Rule Good for Kansas?*, CLE at KU Law (May 17-18, 2018).

While not directly relevant to today's case, this episode illuminates a powerful anti-speech movement within the bar—and an overweening desire among establishment attorneys to police the thought and speech lives of their fellow lawyers. As the institution constitutionally charged with setting ethics policy in Kansas, this court has already wisely rejected such a path.

While black letter First Amendment law *may* permit the kind of punishment sought by the ODA and proposed by the panel in this case, this is far from certain. I take no position on this question in today's case because even if Valdez' speech had no formal constitutional protection, we must still evaluate whether—as a matter of Kansas policy—punishing such speech is wise or desirable. In this context, a review of free speech law as applied to attorneys will be helpful.

"The first axiom of the First Amendment is this: As a general rule, the state has no power to ban speech on the basis of its content." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 462, 135 S. Ct. 1656, 191 L. Ed. 2d 570 (2015) (Scalia, J., dissenting). Of course, as with any "general rule" there are specific exceptions. Kansas has long recognized that lawyer speech, in some circumstances, falls into these specific exceptions. *In re Jordan*, 316 Kan. 501, 542-43, 518 P.3d 1203 (2022). This principle is broadly summarized by Justice Holmes' famous line that a policeman "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. New Bedford*, 155 Mass. 216, 220, 29 N.E. 517 (1892). Stated another way, "[l]awyers . . . trade certain aspects of their free speech rights for their licenses to practice." *In re Comfort*, 284 Kan. 183, 202, 159 P.3d 1011 (2007).

Such broad claims illustrate a concept, but they do not define the rule. "An attorney's speech is limited both in and outside the courtroom. See *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) (opinion of Rehnquist, C.J.)." *In re Hawver*, 300 Kan. 1023, 1042, 339 P.3d 573 (2014). The degree to which an attorney's speech is limited, however, is highly dependent on the facts of any given situation. Because context and content matter, our court has previously stated that "a lawyer's out-of-court advocacy may be subject to limitation when it conflicts with ethics rules that serve substantial government interests, such as guaranteeing criminal defendants' rights to fair trials, or protecting public confidence in the legal system." 300 Kan. at 1042-43.

Protecting "public confidence in the legal system" does not require dogmatic silence by attorneys working in that system—especially when attorneys are bringing attention to perceived problems and inequities. The practice of law, by nature, is adversarial. Punishing attorneys for voicing their criticisms serves to undermine the rule

of law rather than bolster it and creates the impression that "judges can dish but they can't take." *Davis*, 318 Kan. at 247 (Stegall, J., concurring). "The First Amendment is not abridged for the benefit of the Brotherhood of the Robe." *Williams-Yulee*, 575 U.S. at 473 (Scalia, J., dissenting).

The dangers present in this delicate balance between protecting speech and circumscribing attorney speech are at their sharpest in situations like the one now before us—political speech made by publicly elected officials. "[T]he speech of lawyers and judges is subject to special duties placed on members of the legal profession—duties which, at times, by their nature demand that they speak out against abuses of power." Newman Knake, *Lawyer Speech in the Regulatory State*, 84 Fordham L. Rev. 2099, 2112 (2016). Government officials, and especially government lawyers, are often in the best position to understand and speak out against perceived abuses of power in the judicial process. I am mindful that when the government objects to speech, "the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring).

Admittedly, both we and the United States Supreme Court have in the past been willing to allow regulation of lawyer speech—even political speech. See, e.g., *Williams-Yulee*, 575 U.S. at 457 (holding that a Florida ban on judicial candidate personal campaign solicitation did not violate the First Amendment); *Gentile*, 501 U.S. at 1075-76 (opinion of Rehnquist, C.J.) (writing for five justices that Nevada could restrict extrajudicial attorney statements that have "a substantial likelihood of materially prejudicing" a legal proceeding); *In re Comfort*, 284 Kan. at 201-06 (holding that disciplining an attorney for publication of a demand letter did not violate the First Amendment). But the tension with free speech values—and all the goods protected by such values in an open society—is palpable.

36

This gap between the kinds of speech restrictions allowed by courts conducting a strict constitutional review and the values courts are inclined to protect has not gone unnoticed. "The difference between free speech values and First Amendment doctrine is particularly pronounced when it comes to lawyers because of the considerable leeway the Court has offered to states in the regulation of attorney speech." Aviel, *Rule 8.4(g) and the First Amendment: Distinguishing Between Discrimination and Free Speech*, 31 Geo. J. Legal Ethics 31, 39 (2018). If we must choose, long experience and prudence counsel that when setting speech *policy* for lawyers in Kansas, the values undergirding the First Amendment must control even over its black letter application. So when we exercise our constitutional discretion to limn the boundaries of attorney ethics in Kansas, we must not hyperregulate the very First Amendment protections that attorneys and judges are sworn to uphold simply because an attorney's own speech is at issue. See *Williams-Yulee*, 575 U.S. at 474 (Kennedy, J., dissenting) (dissenting to "underscore the irony in the Court's having concluded that the very First Amendment protections judges must enforce should be lessened when a judicial candidate's own speech is at issue").

Without a clear statement on these principles from this court, I fear the continuing chill on attorney speech in Kansas by the well-meaning but aggressive action of the ODA to take up the cause of bruised judicial feelings and punish all manner of "discourtesies." To which I can only say, "Stop it!" Kansas judges are not so delicate. We will not wilt in the face of lawyer criticism—or even an uncouth comment or name-calling. We retain the traditional tools of regulating our courtrooms through contempt or Rule 11 proceedings. *Davis*, 318 Kan. at 247 (Stegall, J., concurring). And most importantly, public trust in the legitimacy of the rule of law can only be harmed by a defensive posture reminiscent of petty gangsters and warlords surrounded by enforcers. In a mature democracy, fragility in leadership sows only distrust. We can and should do better.

37

Because I would hold that KRPC 3.5(d) and KRPC 8.2(a) do not apply to political speech by lawyers, I concur in the judgment that Valdez did not violate any of our Rules of Professional Conduct.

\* \* \*

ROSEN, J., dissenting:  Today's decision allows an attorney to escape accountability for flagrant violations of the Kansas Rules of Professional Conduct (KRPC), particularly in relation to the duty of maintaining respect for the legal system and its officers. Respondent launched reckless public accusations directed at the Seventh Judicial District Court and the chief judge, thereby undermining the integrity of the judiciary and eroding public confidence in the legal process. Attorneys are expected to advocate zealously within the bounds of the law and our ethical standards, not engage in inflammatory attacks that demean the dignity of the bench and bring disrepute to the profession as a whole. I depart from the majority because I believe it has too narrowly interpreted KRPC 3.5(d) (2025 Kan. S. Ct. R. at 388). I would affirm the hearing panel's conclusion that the respondent violated this rule under its correct interpretation and would impose public censure.

Rule 3.5(d) of the Kansas Rules of Professional Conduct prohibits "undignified or discourteous conduct degrading to a tribunal." (2025 Kan. S. Ct. R. at 388). KRPC 1.0(n) (2025 Kan. S. Ct. R. at 318) defines tribunal as "a court, an arbitrator in a binding arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity." The hearing panel concluded that the respondent violated this rule when she issued a press release and published a Facebook post criticizing the credibility of Judge McCabria and his motivations behind decisions he made as chief

38

judge regarding jury trials during the height of the Covid-19 pandemic and his interaction with the district attorney's office regarding the same.

The majority rejects the hearing panel's conclusion. It holds that the respondent's conduct did not violate KRPC 3.5(d) because, while it may have been degrading to the court, the rule prohibits conduct degrading to a court only when the court "is acting in an adjudicative capacity." Slip op. at 19. The majority does not explain what "acting in an adjudicative capacity" means, but it concludes the respondent's commentary did not violate the rule because it "was not made in the context of an actual legal or other adjudicative proceeding." Slip op. at 21. From this, I gather that the majority means degrading conduct violates the rule only if it occurs during or with reference to specific current or ongoing legal proceedings.

This interpretation impermissibly narrows the plain scope of the rules. Together, KRPC 3.5(d) and 1.0(n) prohibit conduct degrading to several different bodies: (1) a court, (2) an arbitrator acting in a binding arbitration proceeding, and (3) a legislative body, administrative agency, or other body acting in an adjudicative capacity. Notably, it lists "court" without any qualification. Consequently, the rules plainly contemplate a prohibition on conduct that degrades the court regardless of what function the court is performing. See *Grievance Adm'r v. Fieger*, 476 Mich. 231, 250-51, 719 N.W.2d 123 (2006) (nothing in the rule prohibiting "undignified or discourteous conduct toward the tribunal" "limits the applicability of the rule only to remarks made in a courtroom"); *Akron Bar Association. v. DiCato*, 130 Ohio St. 3d 394, 394-95, 958 N.E.2d 938 (2011) (lawyer violated rule prohibiting "undignified and discourteous conduct that was degrading to a tribunal" when he called the judge a "lying, cheating bitch" during call with judge's bailiff regarding fee applications).

39

This reading of KRPC 3.5(d) aligns with the legal understanding of the word "tribunal." Black's Law Dictionary defines it as "a court of justice or other adjudicatory body." Black's Law Dictionary 1820 (12th ed. 2024). This supports the notion that in protecting a "tribunal" from degrading conduct, the rule means to shield adjudicative bodies in general, not only during active legal proceedings or in legal filings. This is why the rule protects courts without any qualification; a court is fundamentally an adjudicative body. In contrast, KRPC 1.0(n) qualifies "arbitrator" and "legislative body, administrative agency, or other body" because those entities are not inherently adjudicative bodies. It applies to arbitrators only when they are acting in binding arbitration proceedings, and it applies to other bodies only when they are specifically acting in an adjudicative capacity. In other words, they come under the umbrella of the rule's protection only when they are assuming an adjudicative role.

Finally, this interpretation fits squarely within what the majority proposes is the purpose of KRPC 3.5:  "to protect the legitimacy of the tribunal." Slip op. at 19. When the rules shield the court from conduct degrading to the court in all of its official activity, not just some of it, the rule meets this purpose. See *Application of McLaughlin*, 144 N.J. 133, 154, 675 A.2d 1101 (1996) (noting that "[o]fficers of the court should not be required to fight through insults and gratuitous accusations of bias in order to preserve their objectivity and fairness" and "[v]ituperative behavior creates an atmosphere that can threaten the proper discharge of court functions, including the supervision of bar admissions, and ultimately disserves the public"); *Ramsey v. Board of Professional Responsibility,* 771 S.W.2d 116, 120-22 (Tenn. 1989) (explaining that "[i]t is the duty of the lawyer to maintain toward the courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance" and that "this is a duty which the attorney owes to his profession; an obligation to which he should subordinate his personal animus toward the particular

individual who happens to be filling the office"). The majority fails to explain how shielding a court's legal rulings but not its administrative decisions serves to protect the court's integrity.

Instead of applying the text of the rule as it is, the majority contorts its construction in a way that defies the most natural reading of the sentence and flouts the rules of grammar. The majority seems to reason that the language in KRPC 1.0(n) limiting protection of a "legislative body, administrative agency or other body" to only those "acting in an adjudicative capacity" also applies to the word "court." Slip op. at 18. Thus, the majority figures, the rule shields a court only when it is "acting in an adjudicative capacity." Slip op. at 19. But, generally, a restrictive clause modifies the noun closest to that clause. See The Chicago Manual of Style, § 5.64 (18th ed. 2024) (explaining that relative clauses should immediately follow the noun they modify); see also *Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003) (under last antecedent rule, limiting clause or phrase ordinarily read as modifying immediately preceding noun or phrase). In this case, that means the language "acting in an adjudicative capacity" modifies the final category of entities that directly precede it: "legislative body, administrative agency or other body." Slip op. at 19. This is clearly the proper way to read KRPC 1.0(n) because it follows this grammatical pattern elsewhere in the text. It uses a restrictive clause directly after "arbitrator" to limit the arbitrators that are shielded from degrading conduct to those acting "in a binding arbitration proceeding." The majority makes no suggestion that this language also applies to the term "court" to limit protection of courts to only those acting "in a binding arbitration proceeding." So, I cannot understand why it decides "acting in an adjudicative capacity" applies to the word "court."

The majority supports its interpretation by citing to cases from this court in which the rule has been applied to conduct occurring in the courtroom or in legal filings. While these citations do not detract from the majority's position, they offer it no help. None of the cases support the notion that the rule is inapplicable to conduct outside of the courtroom or legal filings.

The majority also claims that the "corresponding" ABA Model Rule of Professional Conduct, MRPC 3.5, supports its interpretation because the model rule applies only to "actual legal proceeding[s]." Slip op. at 20. But this in fact weakens the majority's position because the language in the model rule is much narrower. It explicitly prohibits "conduct intended to disrupt a tribunal." MRPC 3.5(d). The Kansas language is more expansive, indicating it is meant to govern a broader spectrum of conduct. See *Grievance Adm'r*, 476 Mich. at 251-52 (Michigan rule prohibiting "undignified or discourteous conduct toward the tribunal" is more expansive than model rule's prohibition on conduct intended to "disrupt" a proceeding).

Under a correct interpretation of the rule, the respondent's conduct constituted a clear violation of KRPC 3.5(d), as the hearing panel concluded and the respondent concedes. In the midst of a world-wide public health crisis and an unprecedented time in our court's history, judges faced critical questions that implicated constitutional rights and the administration of justice as well as the safety and security of all court participants and the community at large. Judge McCabria addressed those questions in his official capacity as the Chief Judge of the Seventh Judicial District Court. The respondent took to the press and social media to undermine those decisions and question Judge McCabria's motivation behind them. This undoubtedly cast doubt on the court's integrity and constituted discourteous conduct degrading to the tribunal.

42

I certainly do not mean to imply that one may never question or criticize a judge. However, if there are serious concerns about a judge's integrity or conduct, the rules contemplate a system in which those concerns can be presented in formal complaints to the Commission on Judicial Conduct. See Rules 602-622 (2025 Kan. S. Ct. R. at 515-34) (governing judicial conduct and providing for formal complaint, hearing, and discipline).

In a final point, I am not unsympathetic to First Amendment concerns the rule may present. But I would save that inquiry until a party puts forth the challenge and we have full briefing and arguments before us.

NANCY E. PARRISH, Senior Judge, joins the foregoing dissenting opinion.